ELLEN CARLSON, RESPONDENT, v. KANSAS CITY, CLAY COUNTY & ST. JOSEPH AUTO TRANSIT COMPANY, APPELLANT.*

Kansas City Court of Appeals.   May 3, 1926.

538

*Corpus Juris-Cyc References: Appeal and Error, 3CJ, p. 1415, n. 71; 4CJ, p. 812, n. 57; p. 853, n. 59; p. 858, n. 3; Carriers, 10CJ, p. 1025, n. 79; p. 1040, n. 76; p. 1087, n. 90; p. 1151, n. 34; Damages, 17CJ, p. 1091, n. 85; Evidence, 22CJ, p. 193, n. 86; p. 621, n. 61, 66; p. 724, n. 1; p. 766, n. 15; p. 767, n. 35; p. 770, n. 71; Negligence, 45CJ, p. 1364, n. 98; Trial, 38Cyc, p. 1711, n. 19; p. 1749, n. 98; Witnesses, 40Cyc, p. 2656, n. 11.

*M. J. Henderson, Floyd E. Jacobs* and *H. L. Moore* for respondent.

*Lawson & Hale* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $2500 and defendant has appealed.

The facts show that between 7:00 and 8:00 P. M. of September 12, 1925, plaintiff was riding as a passenger in one of defendant's busses being operated from Excelsior Springs to Kansas City, Missouri; that when the bus neared Liberty, the driver attempted to make a turn to the left at a curve in the road, whereupon the bus slipped or skidded sidewise off of the paved portion of the road into the ditch and against the bank thereof. Plaintiff was thrown from her seat through a window, resulting in her being rendered unconscious and in receiving a number of severe cuts. Plaintiff was taken to the office of Dr. Rothwell at Liberty and there her wounds were sewed up and treated. The main cuts and bruises consisted of an incision over the right breast "just about the length of the breast and angled downward and outward about three or four inches long," and in the vicinity of the pectoralis major muscle; a cut on her right arm beginning near the elbow and back of the same, extending for four or five inches above it; a bruise and irregular cut on the right side of her forehead and a cut on the inside of her left leg and bruises midway between the knee and ankle. In the cut near her breast there was lodged a triangular piece of glass which was extracted by a friend who accompanied her. Plaintiff testified that "her suit and everything" were torn "to pieces" and when she arrived at Liberty she "was soaked and filled with blood all the way through."

Defendant insists that the court erred in permitting plaintiff upon two occasions to exhibit to the jury the clothing that she wore at the time she received the injuries. It is claimed that this exhibition was for the purpose of prejudicing the jury; that there could have been no proper purpose in the exhibition for the reason that plaintiff had testified that she had bled freely and no one had denied her testimony as to the fact of bleeding or the location of the wounds. It is true that plaintiff had described the extent of her bleeding but it is not true that at the first time the clothing was produced before the jury there was any intimation on the part of the defendant that it was admitting anything as to the wounds or their bleeding, or, in fact, that she had been injured at all. On the contrary while all of the injuries testified to by plaintiff at the trial, including the profuse bleeding, were pleaded in the petition, the answer was a general denial and nothing

had appeared at the time of the first exhibition indicating that defendant was not denying everything, including the occurrence itself. In the objection made to their exhibition to the jury, it was not intimated that defendant was not standing on everything implied by the filing of the general denial. There were no admissions whatever made by the defendant at the time of the occurrence of which complaint is made.

The clothing bore the cuts made by the triangular piece of glass and the size of the glass is not disclosed in the record. The glass must have penetrated through the clothing. Aside from the fact that the clothing showed that plaintiff bled profusely, the rent in the clothing tended to show the size of the glass and, with the thickness of the clothing, was some evidence as to the force of the penetration. Of course, under the circumstances, there is no question but that the court did not abuse its discretion in permitting the clothing to be exhibited to the jury even though plaintiff had described the manner in which she bled, and notwithstanding it may have had a tendency to inflame and prejudice the jury. [Keen v. Railroad, 129 Mo. App. 301; Senn v. Southern Ry. Co., 108 Mo. 142; State v. Long, 209 Mo. 366; State v. Duffy, 124 Mo. 1; State v. Murphy, 118 Mo. 7, 14; State v. Moxley, 102 Mo. 374, 389; Holzemer v. Met. St. Ry. Co., 261 Mo. 379; State v. Wilners, 66 Mo. 13, 29, 30; 22 C. J., p. 193.]

When the clothing was produced before the jury the second time it was not directly exhibited to the jury but was produced in connection with the cross-examination of one of defendant's physicians. This doctor testified that he was called by Dr. Rothwell and attended plaintiff in the latter's office shortly after she was injured as well as at the hospital where she remained for about a week. The wounds were sewed up when this physician first saw plaintiff and he would not testify as to how deep they were but notwithstanding this he stated that plaintiff's injuries consisted merely of skin wounds while plaintiff's evidence tended to show that she sustained much more serious injuries, as will hereinafter be shown. He testified that all skin wounds bled freely. The clothing, over defendant's objection, was then exhibited to the doctor and he was asked—

"Q. Was this woman—you say this injury she had, the wounds, were of such slight character as she bled as appears on this clothing here? A. I didn't say anything about it. Q. I believe you said even slight wounds bleed—slight wounds like that? A. I said slight skin wounds bleed. Q. And would you say slight wounds bleed like that, doctor? A. A little red blood on a white surface shows up mighty plain. Q. Let's see, doctor; about this specific clothing? A. I don't know how much blood is on there—I can see some blood."

He testified that the amount of blood shown on the clothing could come from a wound of the skin. The jury had already seen the cloth-

and we fail to see how defendant could complain of the use of it in the cross-examination of its physician, at least, in view of the fact that it appears to have been a legitimate cross-examination as it does not appear that it was merely produced the second time in order to prejudice the minds of the jury. As to the matter of exhibiting to the jury evidence of this kind, a well-known authority states—

"The autoptic proference to the jury of the weapons or tools of a crime, or of the clothing or the mutilated members of the victim of the crime, has often been objected to on ground of undue prejudice (post, # 1863). The nature of this supposed prejudice is illustrated in the following passages: . . .

"The objection thus indicated seems to be twofold. First, there is a natural tendency to infer from the mere production of any material object, and without further evidence, the truth of all that is predicated of it. Secondly, the sight of deadly weapons or of cruel injuries tends to overwhelm reason and to associate the accused with the atrocity without sufficient evidence.

"The objection in its first phase may be at least partly overcome by requiring the object to be properly authenticated, before or after production; and this requirement is constantly enforced by the courts. (Post, # 2130.)

"The objection in its second phase cannot be entirely overcome, even by express instructions from the court; but it is to be doubted whether the necessity of thus demonstrating the method and results of the crime should give way to this possibility of undue prejudice. No doubt such an effect may occasionally and in an extreme case be produced; and no doubt the trial court has a discretion to prevent the abuse of the process. But, in the vast majority of instances where such objection is made, it is frivolous, and there is no ground for apprehension. Accordingly, such objections have almost invariably been repudiated by the courts." [2 Wigmore on Evidence (2 Ed.), section 1157.]

A large discretion in matters of this kind is left to the trial court. The appellate court is at a disadvantage in reviewing such matters because the information gleaned by the inspection of the garments and the like cannot easily be reported for the consideration of an appellate court. There are cases holding that the discretion vested in the trial court in a matter of this kind will not be reviewed. While there are some cases holding that an unreasonable exercise of such a discretion constitutes reversible error, some of which cases are cited by the defendant, the usual practice of appellate courts is to decline such a review. [22 C. J. 767.] We have examined the cases cited by the defendant and while not intending to hold that they are in harmony with the decisions in this State, we find the facts involved in them are entirely different from the situation in the case at bar. Here the

allowing of the original exhibition of the clothing to the jury was not an abuse of the discretion of the trial court, even admitting that this discretion is reviewable, as will readily be seen by an examination of the Missouri cases we have cited. The second production of the clothing, although used at a time after defendant had introduced evidence tending to show that plaintiff had been injured and had received cuts sufficient to cause profuse bleeding, was in connection with a proper cross-examination of one of defendant's witnesses. The extent of the cuts and the seriousness of plaintiff's injuries were never admitted; on the other hand, defendant, as will be hereinafter shown, severely criticises plaintiff's medical testimony as to the seriousness of the injuries and insists that the verdict is excessive.

It is claimed that the court erred in allowing plaintiff's physician, Rush, to change his testimony as to cuts over plaintiff's breast affecting the pectoralis major muscle. This doctor did not see plaintiff until several days after her injuries were received, he testified that this muscle was cut but not entirely through; that there was a depression underneath the scar on plaintiff's breast; that at this point there is a layer of fat and muscular tissue an inch and a half or an inch and three-quarters thick between the skin and the ribs; that there is about a half inch of fatty tissues between the skin and the muscles; that he felt this depression and that the character of the depression indicated to a medical man "that the muscle had been cut, fibre divided someway or through." "It has evidently been cut;" that in his opinion it had been cut. The doctor was then asked, "If this muscle was cut, is it your opinion that it would affect or limit the movement of the arm?" An objection was made whereupon he stated that he could testify only as to his opinion on the matter of its being cut. Thereupon the court ruled that the doctor could not base an opinion upon an opinion by testifying to the effects of the cut. Over the objection of the defendant, the doctor then testified that from his examination, the movement of the arm had not been limited but had been merely weakened. He then testified that he had no way of telling the strength. He was then asked how the cutting of the muscle would weaken the arm. The court refused to permit the doctor to answer this unless he would testify as a fact that the muscle had been cut. Thereupon the doctor was asked if as a matter of fact the muscle had been divided or cut. Over the objection of defendant that the doctor had already testified that he could only give an opinion upon the subject, the court permitted him to say that as a matter of fact the muscle had been divided or cut. It is now insisted that after the doctor discovered that he could not base an opinion upon an opinion he made his opinion as to the cutting become a fact, "and thus get in an opinion as to the effect of the cut." The doctor was not thereafter asked in reference to the effect of the cut weakening the arm.

It will be remembered that this doctor was not testifying as an expert witness. No hypothetical questions were propounded to him. He was testifying from information he had obtained from an examination and treatment of plaintiff. It is questionable whether he was basing an opinion on an opinion when the court sustained the first objection. [11 R. C. L., p. 609; Gallagher v. Lumber Co., 273 S. W. 213, 217, 218.] However, to an untrained legal mind at least, there is not a great deal of difference between a statement of an opinion and a statement of a fact or condition based upon an examination. The difference, if any, between a statement of an opinion and a statement of the existence of a fact or condition, where the doctor has made an examination of the patient, is so slight, if there is any difference whatever, that the court could hardly be convicted of error in permitting the doctor to finally state what he found as a fact. This is so even though it be the law that a witness may not change his testimony on the witness stand, and this is by no means to be conceded. [See Bond v. Railroad, 110 Mo. App. 131; Guthrel v. Slater, 153 Mo. App. 214; Bobbitt v. United Rys. Co., 169 Mo. App. 424; Cravens v. Hunter, 87 Mo. App. 456.]

It is insisted that "the court erred in allowing Dr. Lowry to presume that the ulna nerve was injured and on that to base an opinion that neuritis might result in the future, although he stated he did not think there was any permanent injury." It is not pointed out in the record where this testimony of Dr. Lowry is shown, but upon examination of the record we find that the court struck out Dr. Lowry's testimony wherein he gave an opinion that neuritis might result.

It is next insisted that "the court erred in allowing Dr. Montgomery to express an opinion as to the effect of several muscles, based on another opinion that they had been cut." Dr. Montgomery examined plaintiff a short time before the trial and described the cuts as disclosed by the scars and the extent and nature of the scars. He testified that the scar on plaintiff's breast "ran downward and backward crosswise to the muscle fibre," that there was a slight depression at that point and "the way I brought about the depression was put the muscles so and had her blow out, pushed in with the fingers in the place and found the depression there, so that the muscle fibre, some of them had been cut." This was not an expression of an opinion but testimony as to a fact. The doctor afterwards testified that his physical examination of plaintiff disclosed that the strength in the arm was reduced by reason of the cutting into the muscle but the movement "does not seem to be impaired." It does not appear that the doctor gave an opinion at any time but testified both as to the cutting into the muscle and the effect thereof as a fact. That this doctor could not see the depth of the cut at

the times he made an examination of plaintiff and could not see that the muscle had been cut, did not disqualify him from stating that it had been cut, based upon the test he made in connection with a depression at the scar. However, in no event can it be said that he was permitted to violate the rule against basing an opinion upon an opinion. [11 R. C. L., p. 609; Gallagher v. Lumber Co., supra.]

It is insisted that there was an improper hypothetical question propounded to Dr. Montgomery, but it is nowhere pointed out in the brief in what respect the question was improper. Under such circumstances there is nothing before us for review. [Hunt v. Hunt, 270 S. W. 365; State v. Whitsett, 232 Mo. 511, 529, 530.]

It is insisted that the court erred in allowing plaintiff to attempt to show that the defendant was a subsidiary of the Kansas City, Clay County and St. Joseph Railway Company and that some of defendant's officers were also officers of the railway company; that ''in other words plaintiff attempted to say to the jury that it does not make any difference how much you stick this line for the railroad is behind it,'' and that this was very prejudicial. This testimony was brought out by plaintiff on cross-examination of defendant's physician to whom we have already referred as the doctor who examined and treated plaintiff in Dr. Rothwell's office at Liberty shortly after the accident. Up to the time of the happening of the occurrence now complained of, there had been no intimation in the record that this doctor was in any wise connected with the defendant. There is nothing in the record to show he ever disclosed to plaintiff that he was connected with the defendant at the time he examined and treated her. He had proved to be a very unfavorable witness to plaintiff when upon cross-examination he was asked—

''Q. Dr., are you the regular representative of the blue line? (defendant) A. I have no appointment. Q. As their surgeon? A. No, sir. Q. Or the Interurban? A. I am chief surgeon of the Interurban line. I have no appointment.'' . . . Q. You know, as a matter of fact, don't you, Doctor, that the Interurban operates the blue line through a separate company? A. I know that some of the officers of the Interurban are also officers of the blue line, yes, sir.

''Q. Mr. Mahan is superintendent of both companies, isn't he? A. I think he is. Q. Now, doctor, you are chief surgeon for the Interurban, aren't you? A. Yes, sir. . . . Q. Doctor, you do work for the blue line, don't you? A. I have been called a good many times. I have no appointment as their surgeon. Q. I understand, you would say that you do the work, don't you? A. I have done some of it, yes, sir. Q. And you do work for the Interurban? A. I do most of their surgical work; yes, sir.''

This was cross-examination and we cannot say that the court abused its discretion in allowing it. It is always competent to show

the connection of a witness with a party to the cause in order to test the former's credibility. [Gordon v. Railroad, 222 Mo. 516, 537, 538; State v. McLaughlin, 149 Mo. 19; Village of Humboldt v. Watkins, 123 Ill. App. 62.] If the witness was defendant's physician or if he was called by the defendant a sufficient number of times to give rise to an inference of friendliness between the witness and the defendant, the jury was entitled to know it, and if he was the regular surgeon for the Interurban line and the defendant was a part of that concern, the jury was entitled to know this. We fail to find any error in connection with this circumstance. Of course, "a party cannot be deprived of the benefit of evidence which is relevant and material because it may also have a tendency to prejudice the adverse party in the eyes of the jury." [22 C. J., p. 193.]

Plaintiff's instruction No. 1 told the jury that if it found that plaintiff purchased a ticket and became a passenger upon the auto bus and that the same was operated by defendant, then it was the duty of the defendant to use the highest degree of care to carry plaintiff safely and the failure to use such care would constitute negligence, and it would be responsible for all injuries suffered by plaintiff by reason of such negligence, and if they believed that the bus in which she was a passenger was allowed and permitted to become wrecked or to violently leave the roadbed and that she was thrown from the bus to the road, there was a presumption that the throwing—

" . . . was occasioned by some negligence on the part of defendant and the burden of proof is cast upon the defendant to rebut this presumption of negligence and establish the fact that there was no negligence on its part and that the injuries, if any, sustained by plaintiff were occasioned by inevitable accident or by some cause which such highest degree of care could not have avoided."

The court refused to give defendant's instruction No. 6, which reads as follows:

"The court instructs the jury that the plaintiff must prove her case by a preponderance, that is, by the greater weight of all the credible evidence in the case, and if she has not done so your verdict must be for defendant."

It is insisted that in view of plaintiff's instruction, the court erred in refusing to give defendant's instruction No. 6. It has been repeatedly held that in a *res ipsa loquitur* case such as is this one, it is error for the court to instruct the jury that the burden is upon plaintiff to show negligence on the part of the defendant. [See Price v. Street Ry. Co., 220 Mo. 435, 462; Olsen v. Citizen's Ry. Co., 152 Mo. 426; Porter v. St. Joseph Light, Heat & Power Co., 277 S. W. 913.]

Defendant's instruction is not worded exactly as the instructions in the cases cited, but it merely says that the burden was upon plain-

tiff to prove by the preponderance of the evidence *"her case."* However, it would appear that defendant's instruction was wholly unnecessary and, in fact, a misleading one in this case. This being a *res ipsa loquitur* case, the burden was upon plaintiff to show that she was a passenger on defendant's bus and that while she was riding therein it skidded or left the road in an unusual manner and that she was injured without negligence on her part. [Trowbridge v. Fleming, 269 S. W. 610; Porter v. Light, Heat & Power Co., supra, l. c. 915; 10 C. J., p. 1025; Olsen v. Railway, supra; Lemon v. Chanslor, 68 Mo. 340, 356.] Everyone of these facts were testified to by defendant's witnesses. It is true that they testified that the bus was being driven in a careful manner but this went to the defendant's case, that is, it tended to show that defendant was not negligent. The facts necessary for plaintiff to make out a case being conceded, what necessity was there to give an instruction of the kind offered by the defendant? It would only tend to confuse and mislead the jury. The meaning of the words "her case" as used in the instruction is a more or less technical phrase in a suit of this kind. The court and counsel knew what constituted plaintiff's case in a *res ipsa loquitur* case but the jury did not. If the instruction had been given, the jury would have read it in connection with plaintiff's instruction No. 1. Plaintiff's instruction does not distinguish, to the lay mind, between plaintiff's case and defendant's case as it says nothing about either, and the jury might have been misled as to what was meant by the court's instructing them that they had to find that plaintiff had proved "her case" by the greater weight of the credible evidence. If there had been any issue upon the subject, it would have been a simple matter for defendant to have worded the instruction so as to tell the jury of what plaintiff's "case" consisted.

It is insisted that the court erred in refusing to give defendant's instruction C. This instruction sought to tell the jury that if the driver of the bus "exercised all the care that was reasonably practical under the circumstances, then there was no negligence, and your verdict must be for the defendant." At the instance of defendant, the court gave its instruction No. 4, submitting specific facts covering defendant's theory of lack of negligence on the part of the driver. Defendant's instruction No. 4 covered everything that the evidence disclosed that was sought to be submitted in defendant's instruction C and was phrased in a much better way. [See Zimmerman v. Railroad, 71 Mo. 476, 490, 491; Yarnall v. Railroad, 75 Mo. 575; Edwards v. Railroads, 112 Mo. App. 656.]

It is last insisted that the verdict is excessive. We think there is no question but that there was sufficient evidence to authorize in this case a verdict for at least $2500. In urging this point defend-

ant seems to rely to a considerable extent upon the testimony of its medical witnesses and parts of the testimony of some of plaintiff's doctors that appear to negative the permanency of some of the injuries claimed by plaintiff. In passing upon this contention we cannot view the evidence from such a standpoint. On examination of the record, we find that defendant's medical testimony is directly contradicted by plaintiff's medical evidence. In deciding a point of this kind it is necessary for us only to find if there is any substantial evidence to support the verdict. We are not concerned with conflicts, if any, in the evidence even of plaintiff's own witnesses.

Plaintiff testified that prior to the accident she had some difficulty with the hearing in her left ear but not in the right and that now the hearing of the right ear is impaired to a greater extent than that of the left. She testified that since that time she has suffered with headaches and "I . . . have to hold my hand back of my neck every day with cold towels." That she cannot lift anything heavy with her right arm; that she suffers pain from the arm "around back up to my neck;" that there is pain and a tingling sensation running down to the fingers that "feels like just needles." There was medical evidence that some of the fibres in the pectoralis major muscle had been severed, resulting in the weakening of her right arm; that these muscle fibres would never unite; that there had been a bruise of the ulna nerve; that this nerve controls "the middle finger, ring finger and . . . the inner half of the next finger;" that an injury of this kind to the nerve "will cause a tingling or numbness in those two fingers and half of the other finger and become numb;" that the injuries she received could have affected her hearing; that there was a chance that plaintiff would not recover from the injury to the ulna nerve; that there will always be some weakness in the arm as the result of the fibres of the pectoralis major muscle having been cut.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.