GREYHOUND LINES, INC., v. MR. and MRS. T. H. PATTERSON.

Eastern Section. March 19, 1932.

Petition for Certiorari denied by Supreme Court, July 23, 1932.

654

Noone & Ziegler, of Chattanooga, for plaintiff in error.

Frazier, Rankin & Roberts, of Chattanooga, for defendants in error.

FAW, P. J. The plaintiff in error Greyhound Lines, Inc., a corporation, is a common carrier of passengers, and in that business operates motor buses between Chattanooga, Tennessee, and Atlanta, Georgia.

A bus operated by plaintiff in error, in which Mr. and Mrs. T. H. Patterson were riding as passengers, left the highway, knocked down or "cut off" a telephone pole, and turned over onto its side, near the foot of a mountain it was descending about eighteen or twenty miles north of the City of Rome, Georgia, in the nighttime on December 29, 1930.

Mrs. Patterson sued the Greyhound Lines, Inc., for damages on account of personal injuries suffered by her, and, in a separate suit, Mr. Patterson sued for personal injuries to himself and for expenses incurred on account of his wife's injuries and for loss of his wife's services, etc. The two suits were, by consent, tried together in the circuit court, and have been brought to this court in one transcript with one bill of exceptions and joint assignments of error.

In the circuit court Mrs. Patterson obtained a verdict, and judgment thereon, for $1,500, and Mr. Patterson a verdict and judgment for $350—$50 of which was for his personal injuries and $300 for loss of his wife's services. After its motion for a new trial

had been overruled, the Greyhound Lines, Inc., appealed in error to this court.

Referring to the Pattersons as the plaintiffs and to the Greyhound Lines, Inc., as the defendant: the declaration of each plaintiff contains two counts, and the averments of the two declarations, with respect to the negligence charged, are the same. In the first count it is averred that defendant failed to have the large passenger bus under proper control, was driving it too fast down grade, was not keeping a lookout ahead, and was generally negligent and careless in the handling of the bus; that the bus was defective, and was dangerous to operate, and was allowed by defendant to be operated in a poor state of repair; that its defective condition was known by defendant or could have been known by the exercise of reasonable care and prudence, all of which defendant failed to use, and that the bus was operated at a negligent rate of speed. It is further averred that as a result of the aforesaid negligent conduct on the part of defendant the bus was caused to run off the side of the road at a high and dangerous rate of speed, thereby throwing plaintiff against the sides, seats and floor of the bus, with great force and violence, and consequently severely and permanently injuring plaintiff. The injuries are particularly described in each of the declarations.

In the second count it is averred that the accident happened in the State of Georgia, and at the time it was provided by the law of that State that no vehicle should run more than forty miles an hour, and that vehicles weighing more than ten thousand pounds should not run over twenty-five miles an hour, and penalizing the violator of such law; that at the time the accident happened the defendant was running its bus faster than forty miles an hour; that the bus weighed more than ten thousand pounds; that consequently defendant was violating the provisions of the law, both as to the forty and the twenty-five mile limit, and that this violation was the proximate cause of the plaintiffs' injuries.

The first assignment of error is that "there was no material or competent evidence to support the verdict of the jury and the judgment of the court."

In oral argument at the bar and in their briefs counsel have treated this as an assignment that there is no material evidence to support the verdicts of the jury, and have ignored the included assertion in the formal assignment that there is no "competent" evidence, etc. For obvious reasons, this was proper, and we shall treat the first assignment likewise.

In his testimony, plaintiff T. H. Patterson stated that he and his wife paid their fare from Chattanooga to Atlanta and left Chattanooga on one of defendant's buses at six o'clock P. M., December

29, 1930; that the bus was due to leave Chattanooga at five o'clock P. M., but came in late from Atlanta and left Chattanooga an hour late; that witness and his wife were seated in the front seat on the right hand side of the bus; that when the bus had crossed and reached the foot of the mountain between Summerville and Rome (Georgia), but on a slight down-grade and a straight road ahead, it left the road and turned over on its right side; that the bus was "making pretty good time;" that witness "would say from forty to fifty miles an hour;" that witness had a "hazy recollection of seeing the driver twist his steering wheel over" and then witness realized that the bus was dashing at a telephone post on the right hand side of the road; that then there was a "crash," the bus hit the telephone post and knocked it down and went off the road and down an embankment five or six feet high and "landed" on its right side; that the bus was not meeting another vehicle and that witness did not know what caused it to leave the road.

Mrs. Patterson's testimony with respect to the place where the accident occurred is substantially the same as that of Mr. Patterson, as just related. Mrs. Patterson said that she "saw the driver begin working at the wheel" and then "looked up" and saw that the bus was going out to the right hand side of the road and saw a telephone pole in front of the bus, and then the bus turned over on its side; that "after the accident" she saw that the bus had "struck the telephone pole and cut it down."

The testimony of Mr. and Mrs. Patterson was the only evidence introduced in their behalf with respect to the manner in which the bus left the road and overturned.

Plaintiff proved, without dispute, that the second count of the declaration correctly stated the law of the State of Georgia with respect to the speed of vehicles.

The evidence of plaintiffs does not show what caused the bus to leave the road, and it directly tends to prove only one of the specific acts of negligence averred in the declarations, viz: that the bus was being operated at an excessive rate of speed in violation of the law of the State of Georgia.

The defendant examined the driver of the bus in question and another of its employees who was riding in the bus at the time of the accident, and by these witnesses defendant sought to· prove that the accident was due solely to a latent defect in the mechanism of the bus which a reasonable inspection on the part of the defendant would not disclose.

A common carrier of passengers by motor bus or automobile stage is required to exercise the same degree of care which the law imposes on common carriers of passengers generally, and that is the

highest degree of care for the safety of its passengers consistent with the practical conduct of its business. 2 Berry on Automobiles (6th Ed.), secs. 1928 and 1937; Huddy on Automobiles (7th Ed.), sec. 344; 4 R. C. L., pp. 1153-1154, sec. 588; Cecil v. Jernigan, 4 Tenn. App., 80; Baskin & Cole v. Whitson, 8 Tenn. App., 578, 591; Annotation, 31 A. L. R., 1197, 1206; Annotation, 45 A. L. R., p. 297.

It is a matter of common knowledge that in the ordinary course of events a motor bus does not leave the road, collide with a telephone pole, and overturn down a steep embankment, if the care which the law demands has been exercised by the carrier; hence the doctrine of res ipsa loquitur is applicable to the instant case. Railroad v. Kuhn, 107 Tenn., 106, 112, 64 S. W. 202; 20 R. C. L., p. 185-189, secs. 156-157; 5 R. C. L., pp. 74-77, secs. 713, 714, 715; 1 Berry on Automobiles (6th Ed.), sec. 724, pp. 599-600; Annotation, 45 A. L. R., pp. 306-307; Annotation, 69 A. L. R., pp. 996-998; Heidt v. Peoples Motorbus Co. (Mo.), 9 S. W. (2d), 650; Consolidated Coach Corporation v. Hopkins, 228 Ky. 184, 14 S. W. (2d), 768; Bower Auto Rent Co. v. Young (Texas C. C. A.), 274 S. W., 295; Carlson v. Kansas City, etc., Transit Co. (Mo.), 282 S. W., 1037, 1042.

Where res ipsa loquitur is otherwise applicable, a plaintiff does not lose the benefit of that presumption by alleging specific acts of negligence of the carrier which he fails to prove (Nashville Interurban Railway Co. v. Gregory, 137 Tenn., 422, 433, 193 S. W., 1053), or by introducing evidence tending to show specific acts of negligence which caused the accident resulting in injury to the plaintiff, if at the close of the evidence the cause does not clearly appear, or if there is a dispute as to what it was. Smith v. Creve Coeur Drayage & Motorbus Co. (Mo. Ct. of App.), 296 S. W., 457; Malone v. Greyhound Lines, Inc. (Mo. Ct. of App.), 22 S. W. (2d), 199; Price v. Metropolitan Street Railway Co., 220 Mo., 435, 119 S. W., 932, 132 Am. St. R., 588, 600; Cassady v. Old Colony Street Railway Co., 184 Mass., 156, 63 L. R. A., 285.

It follows from the rules we have stated that when plaintiffs proved, as they did, that they were injured by the overturning of defendant's bus under the circumstances shown in their testimony, and their evidence did not disclose the proximate cause of the accident, they were entitled to a verdict in their favor, unless the defendant proved that its negligence did not cause the injury to the plaintiffs, and that the exercise of due care on its part could not have prevented the injury. Railroad v. Kuhn, supra, p. 112; 5 R. C. L., p. 76; 20 R. C. L., p. 187; 1 Berry on Automobiles (6th Ed.), sec. 724, p. 600; Stegman v. Peoples Motorbus Co. (Mo. Ct. of App.), 297 S. W., 189, 192; Annotation, 45 A. L. R., p. 387.

J. C. George, an employee of defendant, was driving the bus in question when it overturned and injured plaintiffs. George was a driver of fourteen years' experience in driving trucks and automobiles, and had been driving for defendant more than a year at the time of the accident here under investigation. He testified that the bus in question left Chattanooga an hour late and was still an hour late at the place it overturned, which was about eighteen miles from Rome; that he had had no ''mechanical trouble'' with the bus from the time it left Chattanooga until it arrived at the scene of the accident; that he had crossed the ridge and was ''just getting on level grade of the road'' when he ''lost control'' of the bus and it left the road and overturned. We quote from the driver's testimony as follows:

''Q. Now what occurred, what was the first thing that indicated to you there was any trouble of any character? A. I felt the wheel and it was loose, I knew something was wrong.

''Q. How did you know something was wrong? A. Because in driving, you can tell if anything is wrong in the wheel.

''Q. You mean your steering wheel, you lost control? A. Yes, sir.

''Q. State after that what happened? A. Well, it all happened so quick I can hardly tell, but it went off to the right of the road, hit a small telephone post with the right front fender, and ran down into a big washout about four feet deep on the side of the road, my left-hand wheel was on the edge of the road and the right down in the ditch, when it got down in the ditch it laid over on its side.

''Q. How low was this embankment—was that the right or the left side? A. The right side.

''Q. How low was that below the surface of the road? A. I would judge about four feet, I wouldn't be positive.

''Q. It turned over on its right side? A. Yes, sir.

''Q. Could you do anything at all about controlling the bus after the mechanical defects happened? A. None whatever.

''Q. State what kind of brakes you have? A. Westinghouse Air Brakes, and Eastern Air Brakes.

''Q. State if when this defect happened, the thing that caused you to lose control, if that did anything to the brakes? A. It broke my air line on the front wheel.

''Q. Did that make it impossible to apply the brakes? A. Yes, sir. . . .

''Q. Now after the wreck, and after the injured passengers had been disposed of, and gotten on their way towards Rome, state if you made a detailed examination of the bus to see what

it was that had occurred to cause you to lose control of it? A. I did.

"Q. Please tell the jury just what happened mechanically to that truck? A. The left front spindle arm, where the spindle arm goes into the spindle broke off, and that causes you to lose control of the front wheel, in other words the tie rod that goes across and holds the wheels together, that spindle broke on the left so there was no control of the wheels, of the two front wheels, they are separate.

"Q. Can you make a drawing here that will show what you mean? A. Yes, sir.

"Mr. Roberts: I think the jury knows what he is talking about.

"The Court: Let him draw it.

(Witness goes to the blackboard and makes drawing.)

"This is the tie rod that holds the two wheels in position and in line, this tie rod here holds both wheels in line, this spindle arm here goes into the spindle to connect the tie rods together, this spindle arm, this part here (indicating) broke off where the spindle arm goes into the spindle, it broke flush off with spindle, and caused this to drop down, and there was no control of the front wheels.

"Q. Is that a metal knob, or a long piece? A. It is cast on to this spindle, it was a clear break.

"Q. Was that on the left or the right side of the car? A. The left side.

"Q. Now explain exactly to the jury what happened to your front wheels when that occurred? A. A small rock, no bigger than that (indicating) will cause your wheel, one to go one way and the other go the other way.

"Q. State whether the striking of a small rock will deflect the course of the truck or car sooner if the bus or vehicle is going slow or fast? A. It would affect it more when going slow than when going fast because then the momentum will help to right the wheels.

"Q. State what the condition of this mechanical device showed—first, when did you first inspect this truck to see what the trouble was? A. After we got all of the injured out, and had them on their way to the hospital, then I inspected it.

"Q. Who was with you when you inspected it? A. I inspected it myself, Mr. Jolley looked at it while I was down there at the telephone.

"Q. State if you ever made any other examination of it except on this occasion, immediately following the turnover? A. I don't know what you mean.

"Q. After you got it to Atlanta or Rome, did you look at it again? A. When it·was taken into Atlanta they rebuilt it.

"Q. Did you look at it? A. When they got the broken part out, I did.

"Q. State to the jury what the condition of that break was, whether it was fresh or an old break? A. It was a fresh break.

"Q. State if any inspection of the bus could have revealed the possibility of that breakage? A. Couldn't detect it at all.

"Q. Now what kind of pole was this that was broken there? A. It was a little pole, I imagine about eight inches in diameter.

"Q. Did the side or the end of the bus strike that? A. The right front fender.

"Q. The front or side of the fender? A. The side.

"Q. As the car was turning? A. Yes, sir."

The driver further testified that the bus ran fifty or sixty feet from the time he first "noticed any trouble" until it turned over, and that if the brakes had worked and the bus had stayed in the road he could have stopped it in fifteen or twenty feet.

With reference to the brakes on the bus, we quote from the testimony of the driver as follows:

"Q. As soon as you found something was wrong, and the wheel did not guide the car, you put on the brakes? A. I applied the brakes, and pulled up the hand brake.

"Q. Those were Westinghouse Air Brakes? A. Eastern on this car.

"Q. You say that didn't have any effect? A. When that broke the air line runs into the wheel, it broke.

"Q. You don't mean the air itself runs to the hub? A. The air hose that runs from the frame over a diaphram on the front wheel.

"Q. Each wheel has its own diaphram? A. Yes, sir.

"Q. Is that the only braking equipment those buses have? A. They have a hand brake.

"Q. Have you a mechanical hand brake that will put the brakes on? A. We have a hand brake and air brakes also.

"Q. When your air brakes had no effect, what did you do with the hand brakes? A. Pulled it up.

"Q. Did that have any effect on it? A. It slowed it down, yes, sir. It all happened so quick it didn't have time to stop.

"Q. Is that hose connected to the wheel in such a way that the slightest turn of the wheel out of line will break it off? A. I should not think so.

"Q. That is what you contend should happen up until the time you applied the brakes there in the road, your car was

still on the road, was it not? A. It was fixing to go off, it jumped off the side.

"Q. But it was leaning towards the side, still going forward? A. Yes, sir.

"Q. You put the brakes on and something happened to the hose so it did not do any good? A. I saw that the line was broken when I examined it.

"Q. At the time these wheels had not turned themselves very much cither to the right or left? A. When the tie rod came off it jumped to the right.

"Q. Didn't it wobble a little first? A. Yes, sir.

"Q. When you found it was wobbling, you put your brakes on? A. Sure.

"Q. It had no effect then? A. It was all so quick you couldn't hardly tell what you did do.

"Q. From what you do remember about the way it happened, when it wobbled you applied the brakes? A. Yes, sir.

"Q. And that had no effect? A. It slowed up a little bit, and I reached and got the hand brake.

"Q. The reason you did that, the air brake had no effect, and whatever wobbling it had done before, that might have broken the hose? A. Yes, sir.

"Q. If the hose had properly been put on there, it wouldn't have broken? A. There was nothing wrong with it. If there had been they would have caught it in Atlanta.

"Q. You think they would? A. They test the brakes every trip, and a driver is not allowed to take a coach out unless the air brakes worked properly.

"Q. That is a rule of the Company that you are testifying about? A. I don't make the rules.

"Q. You don't know personally whether it was broken or not? A. If it had been broken the air would not have worked.

"Q. Certainly it was not broken until it wobbled, and that wobble did the breaking? A. A pin hole in an air line will kill the air brakes.

"Q. A pin hole? A. Yes, sir, anywhere that the air can escape.

"Q. Do you mean that your Company puts these big buses on the road and runs them at the rate of speed they do, with brakes such that a pin hole will make it not operate? A. If you stick a hole in a gas line it will leak.

"Q. I am asking you about these brakes? A. It is the same thing.

"The Court: It is the same thing as Hydraulic brakes, the same principle.

"Q. Anyway the brakes didn't hold? A. That is right, that is all I know.

"Q. If the brakes had held from the time you observed something was wrong, you could have stopped? A. No, sir.

"Q. How far does it take to stop a bus with brakes going at the rate of speed you were? A. You can stop in fifteen feet, but it had started down that ditch, and the brakes don't do any good when it starts in a ditch, where one wheel is off the front. That is a narrow road, about four feet down the bank, and when the steering gear broke it went right on in the ditch.

"Q. You could have stopped in fifteen feet if the brakes had worked? A. If it had stayed in the middle of the road, · I could have stopped it, yes, sir."

Re-Direct Examination.

By Mr. Ziegler:

"RD. About how much surface was there of this part or piece of metal that was broken off? A., I don't understand what you mean.

"RD. How much surface on this piece of metal that was broken off, fresh break where you could see there?

"The Court: He means the diameter of the break.

"RD. The piece of metal broken off, how much surface was on the broken part? A. You mean where it broke off the spindle.

"RD. Yes, sir. A. I imagine about two and one-half inches.

"RD. Now will you make a diagram similar to this piece, on some paper, and file it as Exhibit 'A' to your testimony? A. Yes, sir.

"The Court: You can do that later.

"RD. What happened when that thing broke, in regard to the wheel? A. The wheels were liable to toe towards each other, or away from each other.

"RD. Would that tend to break the air line? A. Sure.

"RD. You say it happened so fast, by the time you had your hand brake, you had gone over the edge of the road? A. Yes, sir.

"RD. You say you don't know whether that bus weighs 10,000 pounds or more or less? A. I do not."

Re-Cross-Examination.

By Mr. Roberts:

"RD. I want the reporter to read his answer about the brakes—A. I was speaking about the wheels, if they should

toe in, in front, it would break that, I am not talking about being in the road.

"RD. You mean if both wheels turn towards the center the hose would break? A. If it was running along and the wheels ran together, the coach goes up and down, it would make the hose stretch, and would break the hose loose.

"RD. It is your idea that the stretching of the springs broke it? A. That is what I believe.

"RD. That would take a big bump? A. Yes, sir. So the wheels ran in.

"RD. It is your idea the wheels toed in and that made the bus jump up, and that broke the hose? A. Yes, sir.

"RD. Then any time you would run the bus into a depression and cause it to bump up, you are liable to break the hose? A. On a regular road it don't bump like that. A sudden jump of the front end with the wheels in like that would make it raise up, when the wheels toe in it is.

"RD. That would make all of the bus go up? A. The springs would work.

"RD. Now back to my original question, if you hit a depression and made the bus jump, that would break it too? A. The coaches don't jump up like that from hitting bumps.

"RD. You think they will not, but they do hit depressions that cause them to jump up, and that is liable to break the hose? A. I never had one to do that.

"RD. Will you answer by question? A. I have never known one to do that.

"RD. It is just when they toe in that breaks it? A. Yes, sir, that is what I believe."

Re-Re-Direct Examination.

By Mr. Ziegler:

"RRD. You do know something was wrong with the steering apparatus? A. Yes, sir.

"RRD. You say the brakes would do no good after it got off the road? A. No, sir."

We may remark here that the high degree of care required of a common carrier by motor bus applies with respect to keeping the brakes, or other equipment, in proper working order, and that the brakes failed to work at a critical moment is some evidence of negligence on the part of the carrier. 1 Blashfield's Cyclopedia of Automobile Law, p. 946.

Defendant examined one, and only one, other witness, viz: H. F. Jolley, an experienced bus driver in the employ of defendant, who was "sitting behind the driver" on the bus in question when

the accident occurred. Jolley testified that he saw the front end of the bus "jump up and cut around" and he knew that "something was wrong with the bus mechanically," but did not know at the time what the difficulty was;" that after the accident he made an inspection of the bus to ascertain "what the trouble was" and he found that the metal spindle arm was broken; that the condition of the broken surface showed that it was a "fresh break;" that such a break of the spindle arm would absolutely deprive the driver of control of the bus and that it would disconnect the air brakes so that they would have no effect.

The testimony of defendant's witnesses, George and Jolley, was to the effect that it was the rule and custom of defendant to inspect all buses before they left Atlanta, but neither of these witnesses could testify that this particular bus was inspected at Atlanta or Chattanooga on the day that this accident occurred, and plaintiff T. H. Patterson testified that he was in view of this bus at the station in Chattanooga from its arrival to its departure, and that it was not inspected there.

The witness George stated that the bus was moving at a rate of speed "between twenty and thirty miles an hour" on the occasion of the accident, and further, that the bus had a sealed governor which prevented it from running at a greater speed than forty miles an hour; but, on cross-examination, he admitted that the bus was "coasting" down the mountain (or the ridge) when the accident occurred, and that the governor did not limit the speed when the bus was coasting.

The witness Jolley likewise testified that the bus was going at a speed of "between twenty and thirty miles an hour."

Upon the evidence, we think the rule res ipsa loquitur made a case for the jury under the first, or common law, count of the declaration, and it was for the jury to say whether the facts of the occurrence in question, as disclosed by the proof, was sufficient to sustain the plaintiff's allegations. Sweeney v. Erving, 228 U. S., 233, 57 L. Ed., 815, 819; Gill v. Brown, 130 Tenn., 174, 178, 169 S. W., 752; Memphis Street Railway Co. v. Cavell, 135 Tenn., 462, 470, 187 S. W., 179; Nashville Interurban Co. v. Gregory, supra, p. 431; North Memphis Savings Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 188, 196 S. W., 492.

As before stated, plaintiff T. H. Patterson testified that the bus in question was running at a speed of from forty to fifty miles an hour, which was some evidence of a violation of the Georgia statute which provided that no vehicle should run more than forty miles an hour.

Moreover, we think there was evidence from which the jury could conclude that the bus in question weighed more than 10,000 pounds,

and therefore it was unlawful, in Georgia, for it to run at a greater speed than twenty-five miles an hour.

The driver testified that the bus in question was designed to carry twenty-nine passengers, and, concerning its weight, he was asked and answered as follows:

"Q. How heavy is that bus? A. I couldn't say.

"Q. Do you have any opinion about it at all? A. No, sir, I don't pay any attention to that, all of that stuff is in the office, they keep a record there, the drivers don't have that, that is all in the office.

"Q. Now then will it weigh over 10,000 pounds? A. I couldn't say.

"Q. Have you any opinion? A. I imagine around 10,000 pounds.

"Q. You imagine it will weigh 10,000 pounds or more? A. I wouldn't be positive, for I don't know."

It is thus seen that the driver thought the bus would weigh "around 10,000 pounds," and he stated that the defendant had a record of the weight in its office. As the defendant had possession of the bus and a record of its weight, we think the jury might legitimately infer from the proof, in connection with the presumption arising from defendant's failure to disclose the pertinent evidence within its knowledge and control, that the bus weighed more than 10,000 pounds. Standard Oil Co. v. State, 117 Tenn., 618, 625, 672, 100 S. W., 705; Fisher v. Insurance Co., 124 Tenn., 450, 483, 138 S. W., 316; W. U. Telegraph Co. v. Lamb, 140 Tenn., 107, 111, 203 S. W., 752; Stafford v. Stafford, 1 Tenn. App., 477, 483; Citizens Bank v. Langford, 6 Tenn. App., 238, 243.

The operation of the bus in violation of a penal statute was negligence per se, and it was for the jury to say whether such excessive speed was a proximate cause of plaintiffs' injuries. 22 R. C. L., pp. 148-149, sec. 31.

In some cases, there is a distinction between the proximate cause of an accident and the proximate cause of the injury resulting from the accident. 22 R. C. L., 115; Anderson v. Miller, 96 Tenn., 35, 33 S. W., 615, 54 Am. St. R., 812, 31 L. R. A., 604; Deming & Co. v. Merchants Cotton Press, etc., Co., 90 Tenn., 306, 17 S. W., 89, 13 L. R. A., 518.

In the instant case, the plaintiffs were thrown against some parts of the interior of the bus with such force as to inflict cuts and bruises upon their persons. If the jury found that the bus was caused to leave the road, strike the telephone pole, and turn over, by the breaking of the spindle arm, it remained for the jury to decide, among other questions, whether the plaintiffs would have been in-

jured if the bus had not been running at an excessive and unlawful rate of speed, or, in other words, whether the breaking of the spindle arm or the unlawful speed was the proximate cause of the plaintiffs' injuries.

Without further discussion, we find that there was evidence to support the verdict of the jury, and the defendant's first assignment of error is overruled.

It may not be amiss to say here that in this opinion we have used the word "accident" in its "loose and popular sense" (Sweeney v. Erving, supra) rather than according to its strict definition.

The second assignment of error is that "the court erred in overruling defendant's motion to pass the cases, based upon the ground that the deposition of Dr. Harbin, which had been taken by interrogatories upon agreement, had not been returned, and the court erred in overruling defendant's motion for a new trial based upon this ground."

Under well settled rules the matter of passing or continuing cases is within the sound discretion of the trial court, and we find no evidence of an abuse of that discretion in this case. The second assignment of error is overruled.

The third assignment of error is that

"The court erred in refusing to submit the following special issues of fact to the jury:

" ' (1) Was the bus that was involved in this accident and in which the plaintiffs were riding at the time of the accident being operated at an unreasonable or unsafe rate of speed or in excess of forty miles an hour;

" ' (2) Was the accident due to a latent defect of the bus itself, which a reasonable inspection would not disclose;

" ' (3) Was there any contributing cause to the accident except a latent mechanical defect which by reasonable inspection would not be disclosed.'

"And the court erred in overruling the defendant's motion for a new trial based upon this ground."

In the case of Life & Casualty Insurance Co. v. Robertson, 6 Tenn. App., 43, 53, it was held by this court that, in the absence of a statute applicable to the subject, it is within the power of the trial judge, in the exercise of a sound discretion, to direct the jury to return a special verdict in the form of answers to questions (as sought in the instant case), and in the later case of L. & N. Railroad Co. v. Frakes & Payne, 11 Tenn. App., 593, 621, it was held that the parties are not entitled, as a matter of right, to demand such a special verdict. Certiorari was denied by the Supreme Court in the first of the two cases just cited, and the latter case was affirmed by the Supreme Court after certiorari granted. The aforesaid ruling

in the last cited case controls the disposition of the third assignment of error here, and that assignment is overruled.

The fourth (and last) assignment of error is that the verdict of the jury was so excessive as to show passion or caprice on the part of the jury.

The verdicts in these cases have been approved by an able and impartial trial judge, who saw the parties and their witnesses and heard them testify. In the case of Power Packing Co. v. Borum, 8 Tenn. App., 162, 180, we said:

"In a personal injury case, such as we are now considering, the law furnishes no standard by which to measure the compensation to which a successful plaintiff is entitled, but confides the amount of the damages to be awarded to the judgment of impartial jurors, guided by the facts and circumstances of the particular case. Then, before the case comes to this court, the verdict is subject to the scrutiny of the trial judge. As said in the case of Quinn v. Railway Co. (Minn.), 46 A. L. R., 1288: 'In determining whether a verdict is so excessive that a new trial should be granted, much responsibility rests on the trial judge. He is called upon to exercise a practical and sound discretion. This court does not readily substitute its judgment for his, for he is in a far better position to come to the right conclusion than we are. Properly enough, we defer to his judgment and do not interfere, unless it is fairly evident that he failed to keep the jury within the bounds of reason and common sense.' "

And so, finding nothing in the record of the instant case which indicates that the jury was "actuated by any improper motive or guilty of a reckless disregard of evidence" we are content to let the amounts of the verdicts remain undisturbed, and the fourth assignment of error is overruled.

It results that the judgments of the circuit court are affirmed, and judgments will be entered accordingly for the respective amounts of the judgments below, with interest thereon from the date of their rendition, and for the costs of the cause accrued in the circuit court. The costs of the appeal will be adjudged against the Greyhound Lines, Inc., and the sureties on its appeal bond.

Crownover and DeWitt, JJ., concur.