251 S.W.2d 595 (1952)
RUSSELL
v.
ST. LOUIS PUBLIC SERVICE CO.
No. 42477.
Supreme Court of Missouri, Division No. 2.
September 8, 1952.
Motion to Modify and for Rehearing or for Transfer to Denied October 13, 1952.
Mattingly, Boas & Richards and Lloyd E. Boas, St. Louis, for appellant.
Arthur J. J. Bohn, Mark D. Eagleton, St. Louis, for respondent.
Motion to Modify and for Rehearing or for Transfer to Court en Banc Denied October 13, 1952.
LEEDY, Presiding Judge.
This case is before the court on defendant's appeal from a judgment of the Circuit Court of the City of St. Louis in favor of plaintiff on account of damages done to his person and to his automobile. At the beginning of the trial defendant formally admitted its liability, and the item of property damage having been stipulated ($552.79), there was left as the only point of contest the extent of the damages resulting to plaintiff from his personal injuries. The jury found the issues in favor of plaintiff, and assessed his damages at $13,432.79. In compliance with the requirement of the trial court (as the condition upon which defendant's motion for new trial was overruled), plaintiff entered a remittitur of $2500, so that the amount of the final judgment appealed from became $10,932.79.
*596 The three assignments urged for reversal are: (1) Allegedly improper and prejudicial remarks of plaintiff's counsel in his closing argument; (2) submission of the issue of the permanency of plaintiff's injuries; and (3) the amount of the judgment as being grossly excessive. Of these, that last stated is the close and serious question in the case, so that it becomes necessary to state the evidence respecting plaintiff's injuries in some detail.
At the time of trial plaintiff was 49 years of age, and employed by the St. Louis Post-Dispatch as a printer. He had been so employed 29 years. His injuries were sustained July 15, 1949, in a headon collision between his standing automobile and one of defendant's buses which was moving 20 or 25 m.p.h. at the moment of impact. He testified he was thrown against the front end of his car, hitting his chest against the steering wheel. His head struck either the windshield or the top of the car, and his knee somethinghe did not know what. A spectator helped him out of the car, and he stood beside it until the police arrived. He was then taken to a nearby office, and thence by the police in a combination patrol-ambulance to City Hospital. After remaining at the hospital about two hours, he was taken home in an ambulance. His record at the hospital showed "tenderness over left knee. Diagnosis: Contusion of left knee."
The next morning he called his physician, Dr. Solon Cameron. Plaintiff testified that at that time his head, chest, knee and hip were bothering him; his head was bruised and swollen; there was a knot or lump on his left hip; his left knee was swollen and discolored, and he had a bruise with soreness in his chest and ribs. He was off the job 8 weeks next following the accident, his complaint during that period being "mostly my headaches and my knee." Returning to the job, he worked part time at first, putting in from 3½ to 5 hours daily, depending on the condition of his knee. "When it started hurting me too bad, I would go home." He resumed full-time work "shortly after the first of the year" (1950), but, to accommodate him to his injuries, he was given a "sit down" job (laying out ads), whereas he had previously "made up the picture page," an assignment he described as requiring him to stand all day.
Touching his condition as of the time of the trial, he testified that in the mornings his knee did not bother him "too much, but as the day goes on it gets sore and swollen;" that practically every day he works, upon coming home and also at bedtime, he applies hot wet towels to the knee to draw the soreness out; that the knee is partially stiff, so that he walks with some degree of restriction, and it bothers him in going up and down stairs, or getting on and off a street curb, more than walking on the level; that ever since the accident he has usually had a dull headache, "and two or three times a week, I have a severe one;" that his hip "cleared up all right," and that the "ribs cleared up, with the exception of maybe a change of weather I will have a pain in it, or if I try to lift something heavy with my left side I can still feel it, but not to any great extent."
On cross-examination plaintiff stated that the only thing then bothering him to any extent was his head and his left knee; that he took "Anacin" tablets for his headaches, and that they usually gave relief in about half an hour; that as far as the knee was concerned, it was all right after he had had a night's sleep; that it is when he walks on it for a while that it begins to hurt; that he sits down all day at his present job. Concerning the treatments administered by Dr. Cameron at the latter's office, the witness testified: "He just usually takes my temperature, listens to my chest with his stethoscope, and he usually massages my knee and tests how much it will take. Q. Does he give you any heat treatments? A. No. Q. No lamps or diathermy? A. No." The witness further testified that from the time of the accident he had continued to wear a bandage on the kneefirst, what is called an "Ace" (elastic) bandage, and then, at alternate periods, a Z.O. adhesive bandage, the whole thing extending "maybe 7 inches long, and 2½ inches above, and 2½ inches below the knee." *597 On being recalled to the stand on the second day of the trial, plaintiff further testified: That the injured knee "buckles on me at times. * * * It will happen several times a day if I am not careful about how I put my foot down;" that he used a cane for a period following the accident, but he quit using it sometime between January and March "because I was more or less self-conscious of carrying it, and I felt better without carrying it. I didn't want to be conspicuous;" that during the summer season he sits in the back yard with his knee bared to the sun for an hour or more daily, which seems to give temporary relief.
Plaintiff admitted that in 1940 he stepped or fell into a cellar, and that he brought suit against Anheuser-Busch, Inc., to recover damages for the resulting injuries to his person, alleging that his left knee was bruised, contused, strained and sprained; that he suffered a severe nervous shock, and permanent impairment of his nervous system, and was caused to suffer from headaches, dizziness, sleeplessness and general impairment of his bodily vigor, and that each of said injuries "will last into the future and will be permanent." The disposition of that litigation was not shown. It was plaintiff's version, however, that his 1940 knee injury bothered him only for 5 or 6 weeks, and his head bothered him for more than 2 months. Plaintiff was asked if "after the first five or six weeks or two months, whatever it is, you say you didn't suffer any more in the left knee, or headaches?" His reply was, "No, not particularly."
Except for the first week of his disability, plaintiff continued to receive his full regular salary of $99.75 per week (subsequently, in August, 1950, increased to $102.25) during the eight weeks he was off. However, he testified he had been unable to do any overtime work since the date of his injury, in consequence of which he had lost an average of $13 a week, or a total of $931.75 in salary and overtime. However, on cross-examination he admitted that some weeks since his accident he had received "premium pay for coming in before my regular starting time. That is classed as premium, but it is not working in excess of the hours." The extent to which this may have offset his loss of overtime was not developed.
Dr. Cameron, called by plaintiff, testified to the following effect: That on the morning of July 16, 1949, when called to attend plaintiff, he found him in bed complaining of pain over the left side of the chest and in his left knee, and complaining also of his inability to sleep the night before because of a severe headache. There was a bruise and discoloration over the left side of his forehead, and a large bruise and discoloration over the left hip, and a large discoloration over the lower left side of the chest. He removed the Ace bandage applied at City Hospital, and immobilized both the knee and the left part of the chest with Z.O. adhesive plaster bandages. He later prescribed the elastic type of bandage for the knee. In his judgment the condition in the left knee that requires immobilization is a cartilaginous injury which limits active movement, that cartilage being located just below the kneecap. At the time of examination, the left knee was swollen, discolored, and larger in circumference than the right. An X-ray revealed no bone injury, but cartilage trauma would not show up in an X-ray. In his opinion the cartilaginous trauma was in the nature of a tearing, which is a difficult injury to heal.
"Q. What would you say in this particular case with reference to the healing, having in mind it still bothers him over this long extended period of time, that there still is restriction in the use of that knee and pain upon use of it during the day? A. Every effort has been made to restore Mr. Russell to healththat is, by the limitation of movement, by cautioning him to avoid any extra exertion. The pain and discomfort has persevered for fifteen months.
"Q. Do you feel, with that history up to date, that he has had the type of injury, that this injury he suffered to his left knee is a permanent injury? A. I fear that it is.

*598 "Q. Do you feel he is reasonably certain to continue to suffer pain in the future in that knee? A. It is very likely he will."
His diagnosis with reference to the ribs was that there was a separation of the ribs from the cartilage which joins them to the breastbonethis on the basis of acute pain on full breath or raising of the left arm, and the cessation thereof on immobilization of the chest. The pain from the rib injury was then "markedly less, but on any strenuous or unusual activity he is aware of that pain." He attributed plaintiff's headache complaints to the "terrific shock" through which he went in the wrecking of his car, "and it was a big upset to his nervous system." He saw plaintiff daily for the first week or ten days at his home, then about every second or third day until August 27, since which date he has been coming to his office about once a week. His fee for professional services to the date of trial was $250. The nature of the office treatments was thus described on cross-examination: "We would measure the knee, we would examine the limitation, the activity he was able to endure without discomfort, and we would alternate between the Z.O. adhesive, when he complained of severe pain, and the elastic Ace bandage." No heat or diathermy treatments were administered.
Dr. Leon Fox, orthopedic surgeon, testified for plaintiff that he examined plaintiff with reference to his chest and left knee on November 18, 1949, and October 13, 1950. At the first examination he evidently had pain and tenderness on palpation over the left fifth and sixth ribs 3 inches from the midline suggestive of some change in the junction between the bony and cartilage portions of the ribs, which can't be seen on X-ray. There was also limitation of motion of the left knee, with tenderness over the medial or inner cartilage, the tenderness being quite marked, indicating some damage to the cartilage. Rotary motions produced pain over the internal space in which the cartilage lies. On the last examination, patient was still having considerable difficulty with his knee. It was necessary for him to wear an elastic knee support. There was still limitation of knee motion and still considerable tenderness over the medial cartilage. "The impression at that time was that he still has a persistent tear of this medial cartilage, which has not healed."
"Q. Having in mind this injury was suffered on July 15, 1949, and has persisted down to date, which is a year and three months, and that your examinations in November, 1949, and October of 1950, revealed the findings you have indicated, what is your judgment as to whether or not the injuries suffered, particularly to the left knee, is one of of permanent character? A. A tear of one of the cartilages of the knee which is still causing symptoms after 6 weeks is a permanent injury.
"Q. Is that injury one that is reasonably certain to cause pain in the future? A. Yes, if a patient is having trouble after six weeks to two months from the time of an injury to a cartilage, they will continue having difficulty, unless the cartilage is removed.
"Q. That will entail a considerable operation? A. Yes. The knee joint has to be opened and it bears a considerable amount of risk."
Dr. Fox further testified that the symptoms of knee injury testified to by plaintiff are those you ordinarily expect to find and do find in cases of a person suffering with a torn medial cartilage. With reference to the cause of the condition which he found in plaintiff's ribs, his impression was that he had a slight separation of the junction of the bony from the cartilaginous portion of the rib which often occurs from a severe blow. At the time of his last examination the chest was no longer sore on pressure and patient stated he didn't have as much difficulty with the chest as previously. The symptoms of the knee injury were practically identical with what they had been the first time.
Dr. John Patrick Murphy, testifying for the defendant, stated that he examined plaintiff once for the defendant in November, 1949, and that plaintiff stated he had injured his chest and the left side of his head and had occasional discomfort in the chest, but complained mostly of his knee, *599 stating that it was sore and stiff when he sat for any time and sore when he walked any distance and when he stepped on it in a slightly bent position; that he stated that he also had intermittent headaches every three or four days which were relieved by "Anacin" but not by aspirin. He complained of tenderness and soreness over the eighth rib on examination. On examination of the knee he complained of tenderness over the medial aspect, the internal lateral ligament which goes from the top to just below the knee and makes for stability of the knee. Based upon his examination and the complaints, his conclusion was that he thought plaintiff had a sprain of the internal lateral ligament of the knee joint. He has no quarrel with other medical opinion to the effect plaintiff sustained a torn cartilage in this accident, but in his opinion he thought he had an injury to the medial ligament, his opinion being based upon his examination and the fact that the tenderness he found was near a cartilage.
There was testimony to the effect that two other physicians had examined plaintiff at Dr. Cameron's request, but they were not called as witnesses. One of them, Dr. Forsten of the medical staff at Missouri Baptist Hospital, saw plaintiff at the latter's home about two weeks after the accident in company with Dr. Cameron. The only showing as to the nature of his examination was, as testified by plaintiff, that it was confined to the knee. Dr. Cameron testified that his son-in-law, Dr. Harold Walters, also saw plaintiff at his (Dr. Cameron's) office from time to time. On this evidence defendant's counsel argued to the jury that it was their duty to infer that the testimony of the two physicians mentioned "would be adverse to plaintiff's case they would hurt himand that is the reason they are not here. * * * they would not have gone along with the plaintiff's story." That portion based upon compulsion or duty to so infer was stricken on plaintiff's objection, and the language "may infer" substituted. In answer, plaintiff's counsel in closing argued that defendant itself could have brought in the two doctors in question, stating: "What is he [defendant's counsel] talking about bringing these doctors in? He could bring them in after their names were mentioned. * * * He has the process of this court to bring in any witness whose name is mentioned. I don't say it is his duty. * * * Don't you know that anybody that has any adverse testimony any timeespecially the Public Service Companythat they bring the doctor, if they have a dime's worth." Defendant objected, and the failure of the court to instruct the jury to disregard this argument is the first proposition urged for reversal. Under the circumstances above outlined there was no error in that ruling. Dr. Cameron, plaintiff's regular physician who treated the case, testified fully as to the nature and extent of the injuries, as did Dr. Fox, the orthopedic surgeon. There is neither claim nor showing that the two who were not called prescribed for or treated plaintiff, and, at best, their connection with the case was more or less casual, as consultants, and there is nothing to suggest their knowledge of plaintiff's condition would be equal or superior to that of Drs. Cameron and Fox. The rule with respect to an unfavorable inference arising from the failure of a party to introduce a witness peculiarly available to him, or under his control (such as his own physician) is subject to the limitation, among others, "that no [such] unfavorable inference is to be drawn from the nonproduction of evidence, unless such evidence, in respect to the fact to which it would have been relevant, would have been superior to the evidence which was adduced, so that where it appears that the evidence which was not produced would have been relatively unimportant in the case, either as inferior to that already realized, or else as merely corroborative of, or cumulative to, such evidence, then no unfavorable inference is warranted * * *. Miller v. Fleming, (Mo.App.) 259 S.W. 139; 22 C.J. 115-118." Roehl v. Ralph, (Mo.App.) 84 S.W.2d 405, 413. The matter is thus stated in Wilson v. Miss Hulling's Cafeterias, 360 Mo. 559, 570, 229 S.W.2d 556, 562: "Defendant was not required to produce every available witness, and an unfavorable inference may not be drawn where the witnesses produced had equal or superior knowledge to those not produced." *600 See, also, Anno. 135 A.L.R. 1375; II Wigmore, Evidence, 3d Ed., § 287, p. 168. Under these authorities defendant was not entitled to argue the effect of plaintiff's failure to call the physicians in question, and plaintiff's counsel was therefore warranted in his reply remarks in that connection. In any event, the net result would seem to have been nothing more than about an even exchange as between opposing counsel, and consequently no prejudice.
The essence of defendant's claim of error in submitting the question of the permanency of plaintiff's injuries as an issue is thus stated in its brief: "It appears that the only proof of permanent injury consists of Dr. Cameron's testimony that he `feared' that the injury was permanent, and Dr. Fox's testimony that a tear of a cartilage which caused trouble after six weeks was permanent, and that he had the `impression' that plaintiff had a tear of his cartilage. There is no evidence that there was a tear. Dr. Cameron said the injury was `in the nature of a tear,' and Dr. Fox said the `impression' was that there was a tear. Such testimony does not arise to the dignity of substantial evidence."
This construction of the testimony of these witnesses must be rejected as being too narrow. Dr. Cameron did express "fear" that the injury to the left knee was permanent, but any doubt or uncertainty created by the use of that term would seem to have been dispelled by the next following question and answer, viz.: "Q. Do you feel he is reasonably certain to continue to suffer pain in the future in that knee? A. It is very likely he will." When one is asked if a thing or condition is "reasonably certain" to occur or remain, and the reply is that it is "very likely" so to do, such answer is tantamount to a direct affirmation of that probability, and should be so treated, at least in the absence of an objection. It is manifest from the testimony hereinabove set out that the doctors were attempting to, and did express their opinions in such a way as to make them of sufficient evidentiary value to justify the submission of the permanency of the knee injury as an issue in the case.
The facts in relation to plaintiff's injuries have been purposely set forth at length for the purpose of considering the charge of excessiveness of the judgment. The left knee injury was undoubtedly severe, and to a lesser extent the chest injury. Plaintiff's medical evidence as to the permanency of his injuries was limited largely to that in relation to the knee. His physicians were not asked to express an opinion as to the permanency of his headaches, and the latter was his only other substantial complaint at the time of trial. It is true he was badly shaken up, and received numerous severe and painful bruises, as previously outlined. It was not claimed that he suffered a concussion; he was not rendered unconscious; no bones were broken; he spent only two hours in the hospital; he lost only one week's regular salary; he works steadily at a full time job with his same employer, and receives wages of $102.25 per week, and this he is able to do without resort to a cane; there is no substantial evidence of the likelihood of his knee injury continuing to adversely affect his ability to earn overtime pay. His chest and hip injuries had cleared up satisfactorily. Assuming the jury allowed the amounts shown by the evidence for medical expenses ($280), loss of salary and overtime to the date of trial ($931.75), and the amount stipulated as property damage ($552.79), and deducting the total of these items ($1764.54) from the $10,932.79 final judgment leaves $9168.25, which sum, it may be inferred, was allowed for injuries to the person. We shall not add to the length of this opinion by contrasting plaintiff's injuries with those involved in the considerable number of cases to which we have been cited in the briefs. But considering the case on its own merits, and in the light most favorable to plaintiff, and taking into account the continuing decline in the purchasing value of the dollar together with the other pertinent factors on review of excessiveness of awards, Young v. Terminal R. R. Ass'n, Mo.Sup., 192 S.W. 2d 402, 406; Schaefer v. Transamerican Freight Lines, Mo.Sup., 173 S.W.2d 20, 24-25, we are constrained to hold that the judgment is still excessive by $1750. If, within 15 days, plaintiff will enter remittitur of *601 that amount in this court, the judgment will stand affirmed in the sum of $9182.79 as of October 17, 1950; otherwise, it will be reversed and the cause remanded for new trial.
All concur.