**GRACE**

v.

**ST. LOUIS PUBLIC SERVICE CO.**

No. 28708.

St. Louis Court of Appeals.

Missouri.

Jan. 19, 1954.

Rehearing Denied Feb. 12, 1954.

See also Mo.Sup., 249 S.W.2d 409.

Salkey & Jones, Carroll J. Donohue, Morton M. Hartz, F. Daley Abels, St. Louis, for appellant.

Inman, Dyer, Gray & Dreher, Charles E. Gray, Byron A. Roche, St. Louis, for respondent.

HOUSER, Commissioner.

Personal injuries action by Lorraine Grace against St. Louis Public Service Company. A trial jury returned a verdict for plaintiff for $6,250. From the judgment rendered upon the verdict defendant has appealed.

Plaintiff's petition, after setting up the passenger-carrier relationship, alleged that defendant negligently caused or permitted its motorbus, "while in motion, to suddenly check its speed with an extraordinary, sudden, unusual and violent force, whereby plaintiff was caused to be thrown," etc. The cause was submitted under the doctrine of res ipsa loquitur.

On February 13, 1950 plaintiff was a passenger upon defendant's bus which was southbound on Kingshighway in the City of St. Louis. The bus stopped at a regular loading zone at Easton Avenue. As the bus pulled away from the curb and after it had gone a distance variously estimated at from ten feet to "approximately a block," the bus came to a sudden stop, as a result of which plaintiff was thrown forward and backward and injured.

Defendant contends that it was error to submit the case on the res ipsa loquitur theory because plaintiff's evidence definitely proved the precise and specific negligence which caused the injury. Under the controlling decisions we are obliged to rule that plaintiff's evidence did not show specific negligence. Plaintiff's personal testimony revealed nothing with respect to the cause of her injury except that the bus came to a "very, very sudden" stop. The testimony of plaintiff's witness Maude Brower did not show specific negligence. All that she added to plaintiff's story was that after the bus came to a sudden stop she saw an automobile facing west, parked directly in front of the bus, and that she "imagined" that the bus driver applied the brakes "to stop that quickly," but that she could not honestly state that the driver applied the brakes. Defendant depends upon the testimony of plaintiff's witness Louis Minzes to establish its point. Minzes was sitting in the front seat next to the door on the west side of the bus, looking out of the front window at the time the bus stopped at Kingshighway and Easton Avenue. He had a clear view of Kingshighway. He described the movement of a Buick automobile northbound on Kingshighway as it executed a "long, sweeping turn" across the white line toward a White Castle restaurant driveway which was located on the west side of Kingshighway some 30 feet south of the bus loading zone. He presumed that the driver of the Buick was going to make a left turn into the White Castle driveway. In commencing the long sweeping turn the driver of the Buick started from the extreme east side of Kingshighway. Minzes did not notice any signals given by the driver of the automobile. As the Buick started to turn in front of the bus, the bus came to a sudden stop. When Minzes first saw the Buick it had momentarily stopped some 50 feet south of the driveway. The bus was stopped. As the bus started forward the Buick continued to make a left turn. The Buick kept coming and the bus went into motion. As the bus went into motion the driver of the bus was "putting change away and glanced out the window and putting some more change away and glanced out, I should have said because the car was coming, coming close to it. Neither one was going very fast, but it sure stopped." The stopping

gave Minzes "an awful jolt." From the time the bus started up from the loading zone until it finally came to rest it traveled 25 to 30 feet, coming to a stop just about the middle of the White Castle driveway. The following appears in the record in the examination of the witness Minzes:

"Q. And you were watching the operator as he brought the bus to a stop? A. I was.

"Q. You saw him applying the brakes and bringing the bus to a stop? A. No, I didn't see that.

"Q. What did you see him do? A. Well, after he left I noticed the operator was counting change and glancing out of the window just like I stated, and all of a sudden I knew the Buick was coming closer. I knew there was going to be an impact or close to it, and the operator, I guess he just put on the brakes. I didn't pay any attention to that though, yet I was watching him.

"Q. You were watching the operator? A. That's right.

"Q. Could you feel the brakes of the bus being applied? A. I did.

"Q. You have been on buses before when the brakes were applied? A. Yes, sir.

"Q. You know what it feels like when you are riding a bus and the brakes are applied? A. Not that bad.

"Q. Sir? A. I don't know what it feels like when they are applied that bad.

"Q. I am not speaking of a sudden stop; I am speaking of any kind of a stop. So you could tell when you were on the bus on this occasion that the brakes were being applied and the bus was being stopped? A. I would say yes."

There was a collision between the bus and the automobile, so slight that Minzes did not realize at the time that it had occurred. When the bus came to a stop the automobile was right against the bus, that is, the right side of the front bumper of the automobile was against the left front side of the bus, the automobile facing northwest. The following testimony of Minzes is pertinent:

"Q. Do you know of your own knowledge that the brakes were applied or are you merely assuming that? A. I would say that I am assuming that.

\* \* \* \* \* \*

"Q. Do you know of your own knowledge what caused the bus to stop, of your own personal knowledge? A. Common sense just told me that it was the brakes that was applied, that is all.

"Q. Well, sir, do you know of your own knowledge what caused it to stop? A. No.

"Q. Just tell us what you mean, what did you feel and what do you know about it. A. I felt the sudden stop, it could have been the brakes or could have ran up against a solid wall.

"Q. You know there was no solid wall there? A. That's right.

"Q. Well, can you tell what caused the bus to stop, of your own knowledge now, not what you heard but I mean from what you then felt and heard and saw? A. I am not able to say what made it stop."

Under the holdings in the cases of Semler v. Kansas City Public Service Co., 355 Mo. 388, 196 S.W.2d 197; Belding v. St. Louis Public Service Co., 358 Mo. 491, 215 S.W.2d 506; Williams v. St. Louis Public Service Co., Mo.Sup., 253 S.W.2d 97; McCaffery v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 361; and White v. St. Louis Public Service Co., Mo.Sup., 259 S.W.2d 795, plaintiff is not to be deprived of the benefit of the res ipsa loquitur doctrine. Applying the rulings of these cases to the instant situation it may not be said, after all of plaintiff's evidence was in, that the real or precise cause of plaintiff's injuries was definitely shown by direct evi-

dence, as required. Williams v. St. Louis Public Service Co., supra. The specific negligence causing plaintiff's injuries still remained in doubt. The inference which defendant contends necessarily must be drawn (that the operator of the bus made a sudden and violent application of the brakes) was not proved by specific facts but depends for its validity upon the imagination of the witness Brower and the conclusions of the witness Minzes. The latter did not see the operator apply the brakes. He merely "guessed" that the operator put on the brakes. He did not "pay any attention to that." While he "felt" the application of the brakes and had experienced the "feel" of the application of brakes he was not acquainted with the feel of a brake application "when they are applied that bad." He was merely assuming that the brakes were applied. "Common sense just told" him that, but he did not know of his own personal knowledge and was unable to say what caused the bus to stop. This testimony constitutes nothing more than conclusions and results, and does not amount to specific facts, acts or conduct of the bus operator causing the sudden stop. See White v. St. Louis Public Service Co., supra, 259 S.W.2d loc. cit. 799.

While the occasion for the making of a stop was shown, viz., the operation of the Buick across the path of the bus, plaintiff did not go further and show the specific negligent act of defendant which caused the sudden stop. In its most favorable light plaintiff's evidence proved no more than that the stop was caused by the effect of brakes applied by the operator, but whether the brakes arrested the movement of the bus as the result of some negligence in the *operation* or some negligence in the *maintenance* of the braking system was not shown. See McCaffery v. St. Louis Public Service Co., supra. Minzes testimony went no further than to afford an equal basis for inconsistent conclusions, namely, that the sudden stop was due to the sudden and violent application of the brakes by the operator's act, or because of a negligently maintained transmission system.

Williams v. St. Louis Public Service Co., supra, 253 S.W.2d loc. cit. 101.

Plaintiff's evidence in the instant case was not as specific as plaintiff's evidence in the Belding case, supra [358 Mo. 491, 215 S.W.2d 509]. In that case the plaintiff herself testified that there was "'a sudden application of the brakes'"; that "'when they put on the brakes the jarring threw me to the floor'"; that she could feel the application of the brakes and heard "a 'squeaky noise'" from the brakes. This testimony was held not to clearly point out and identify any specific negligent act or omission on the part of the defendant or driver with respect to the function or application of the brakes. See also Valley v. Kansas City Public Service Co., Mo.App., 259 S.W.2d 387, in which although plaintiff's witness testified that the operator of the bus made a sudden application of the brakes to keep from hitting a car which suddenly turned into the path of the bus—that he "slammed on" the brakes—it was held that plaintiff's evidence did not prove specific negligence. Compare Mueller v. St. Louis Public Service Co., 358 Mo. 247, 214 S.W.2d 1.

But it is urged that the proof that the bus operator failed to warn the driver of the Buick despite the imminence of a collision and his conduct in failing to keep an adequate lookout reveal specific negligent acts which created an emergency and precipitated the sudden application of the brakes. Of course the inattention of the driver while he was putting away his change, and his failure to issue a warning did not directly cause the sudden stop of the bus. Regarding these acts for the moment as acts of specific negligence their effect at most was to help precipitate the occasion for the making of a stop. If they had directly resulted in a violent collision which had caused plaintiff's injuries there would be force to the argument. But in this case these acts of specific negligence were not the direct or proximate cause of the sudden stop and went no further than to contribute to the creation of the occasion for the making of the stop. They do

not in and of themselves account for or explain, nor were they the precise cause of, the sudden application of the brakes or the sudden stopping of the bus.

Defendant relies heavily on Hoeller v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 7, 12. That case was readily distinguished from a factual situation similar to the case at bar in the Belding case, supra, 215 S.W.2d loc. cit. 511, on the ground that the daughter's testimony in the Hoeller case made a case of specific negligence with respect to an improperly applied pressure on the brakes ("the brakes were suddenly jammed on"). The court further pointed to her familiarity with the "feel of the car" as brakes were being applied, plaintiff's testimony that she had felt the brakes being suddenly applied, and the fact that the stop was at a regular stopping point for the discharge of passengers. For the same reasons the Hoeller case may be distinguished from the case at bar. In addition, the testimony in the Hoeller case was more definite and certain, whereas Minzes in the instant case confessed that in his testimony he was "guessing" and "assuming." He did not see the operator apply the brakes and did not know of his own personal knowledge what caused the bus to stop. In the cases of Oblamski v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 344, and Kastanas v. St. Louis Public Service Co., Mo.App., 251 S.W.2d 973, cited by defendant, this court reversed judgments for plaintiffs in cases submitted under the res ipsa loquitur doctrine on the ground that specific negligence in the application of the brakes was shown. It is to be observed, however, that the evidence in those cases that the brakes were improperly applied did not rest upon conclusions and assumptions of passengers in the bus, but came directly from the driver of the bus in each instance (the person who was the best informed of anyone on the bus with respect to the application of the brakes) and the testimony was of such a character as to constitute direct proof of the specific act or conduct of the bus operator causing the unusual occurrence. Compare Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W.2d 599, where plaintiff called the drivers of both colliding buses as her own witnesses and in which plaintiff's evidence revealed specific negligence. In the case at bar plaintiff relied on indefinite testimony of passengers of such a nature that it affords no more than a basis for inconsistent conclusions. She did not call the bus driver. The Oblamski and Kastanas cases, supra, do not aid defendant in the instant situation.

Next, defendant complains that the court erred in refusing defendant's Instruction C. As submitted, Instruction C consisted of two paragraphs. The first paragraph follows:

"The Court instructs the jury that the defendant was not only required to exercise the highest degree of care for the plaintiff's safety, but was also required to exercise the highest degree of care for the safety of the driver of the automobile mentioned in the evidence."

The second paragraph directed a verdict for defendant upon a finding that the northbound automobile mentioned in evidence suddenly turned into the path of the southbound bus and in close and dangerous proximity thereto, thus confronting the bus operator with an emergency; that the latter made an emergency application of the brakes in order to attempt to avoid a collision with the automobile; that the sudden stop of the bus was caused "solely and only" by the emergency application of the brakes and did not result from any defect in the bus, brakes, or mechanism thereof; that "in so operating the bus the operator was exercising the highest degree of care" and did not cause or contribute to cause the emergency, and that defendant "was not negligent in any manner whatsoever." Defendant complains that the action of the court deprived defendant of its right to bring to the attention of the jury the fact that it owed the highest degree of care not only to plaintiff but also to the driver of the Buick automobile, and thus denied defendant a complete and proper converse verdict-directing instruction.

Although Instruction C was refused, the court gave Instruction 3. The latter instruction was identical with the second paragraph of Instruction C. In other words, the court gave all of the refused instruction except the first paragraph quoted above. Under these circumstances defendant cannot justly complain of the action of the court in refusing Instruction C. While the statement contained in the first paragraph of refused Instruction C properly declared the law with respect to defendant's duties and properly could have been given, Nix v. St. Louis Public Service Co., Mo.App., 228 S.W.2d 369, it was not reversible error to refuse to give it because the jury, in order to exonerate defendant under the instruction, was required to find that defendant made an emergency application of the brakes in an effort to avoid colliding with the automobile and that in so operating the bus the operator *was exercising the highest degree of care*. The duty of defendant not only to the plaintiff but also to the driver of the Buick automobile was therefore plainly indicated to the jury, and the precise burden which as a consequence fell upon defendant in that connection was thus fully covered by Instruction 3. It cannot be said that defendant's theory of the case and its defense was not fully and adequately covered in all vital respects by given Instruction 3. The failure to include the first paragraph of refused Instruction C, which was but an abstract statement of law, did not deprive defendant of its defense or in any manner restrict the presentation of defendant's theory of the case. This point is ruled against defendant.

Finally, defendant claims that the verdict of $6,250 was excessive. Plaintiff, age 33, was in good physical condition prior to the accident. On February 13, 1950 she was thrown forward completely out of her seat in the bus. Her stomach struck the seat in front of her and then she fell backwards, striking her back on the back of the seat. She went on to work in an excited state as a result of the accident. After she reached her place of employment her lower back

ached badly. She remained at work all that day and suffered from "pretty" bad pains that night. She could not sleep. She also had pains going up the back of her neck into her head behind the ear. Those pains continued the next day and all that week. At the trial on September 15, 1952 plaintiff testified that she has those pains once or twice a week; that they start when she gets nervous. On February 14, 1950, after work, she visited her family doctor. He found considerable bruising and swelling in the right sacroiliac region and over the right hip, muscle spasm, swelling of the soft tissue over the sacrum and ilium and down on the gluteal region. After making tests he determined that the right leg was definitely weaker and less stable than the left leg. There was some lack of control and ability to maintain her body weight on one leg. The sensation of the right leg and the reflexes on the right side were somewhat diminished, indicating involvement of the nerve structure. X-rays showed an abnormal enlargement of the transverse process of the fifth lumbar, known as sacralization. X-rays taken two years later show "a little change" in the spacing between the lamina of the fifth lumbar and the first sacral vertebrae with what seemed to be a slight tilting toward the left side, indicating somewhat of a compression and decrease in the space, which means the loss of intervertebral pulp tissue. Although there was no concrete evidence of displacement of pulp tissue, the condition pointed somewhat to a constant pressure there. There was tenderness in the lower part of the back, the pain sometimes radiating out into the hip, down the lower part of the leg to the knee and lower leg. Pain was provoked by extension of the leg on the hip, pulling the leg back in hyperextension, and rotation of the hip with the leg out. Muscle spasm was always present in such tests. Treatment consisted of wearing a back support, and temporary relief from pills and by injections of procaine, hydrocortisone, and epicain. Eighty-five injections were made into the vertebra with a 5-inch needle. The object was to relax the muscle spasm sufficiently to permit realignment of bone ab-

normalities, but no cure having been effected by two years of this type of treatment the family doctor was of the opinion that only surgical procedure could be used to correct the condition. This would entail a splinting of the vertebrae to stabilize the low lumbar area. It would require the removal of a piece of bone from the crest of the ilium and the splinting of the spinous process with this bone. This takes several months in a plaster cast to accomplish complete unification. It is a major operation with a "fair, very good" chance of "knocking out the pain." Such a procedure would cause a stiffening of the back. In her present condition she is in constant jeopardy of having more serious injury as a result of falls. There was independent testimony that on several occasions since February, 1950 while walking in a normal manner plaintiff has fallen on the sidewalk for no apparent reason. It was the doctor's opinion that with her congenital defect, the twisting she received on the bus was enough to cause a complete disalignment of the bony framework on the right side, with loosening of the supporting structure, abnormal motion of one bone over the other, overriding of the bones and impingement of the nerve structure which causes loss of control of her leg at times; that this is a permanent condition and the pain will be "continuous and perhaps intermittent, maybe relief temporarily from this line of treatment that she has been getting, and with rest and complete back support." Plaintiff testified that she has difficulty in walking, that if she walks about three blocks her right leg swells; that she has been unable to participate in athletics as she formerly did; that she has been unable to do her housework; that she cannot bend over and if she twists her body sharp pains shoot from the middle of her back down into the leg. Other medical evidence indicated rigidity, tremors of the right hand, impaired reflexes of the right side, tenderness on pressure in the middle and upper lumbar area, diminished sensation over the entire right side of the body, and tenderness along the course of the sciatic nerve.

On the other hand the evidence clearly indicated that all medical services were rendered at the doctor's office and that plaintiff did not require the attendance of a physician at home; that she was not rendered unconscious, sustained no broken bones and required no hospitalization. Plaintiff was not confined to her home as a result of the injuries but continued in her employment without any interruption or reduction in pay. There was no serious impairment of her capacity to carry on desk work, which was the type of employment in which she was engaged. No special damages, medical or for medicines, or for extra help in the performance of plaintiff's domestic duties were proved.

 Defendant cites Kulengowski v. Withington, Mo.App., 222 S.W.2d 579; Harding v. Kansas City Public Service Co., Mo.App., 188 S.W.2d 60; Roberts v. Carter, Mo.App., 234 S.W.2d 324; and Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428. In the Kulengowski, Harding and Roberts cases, supra, the allowable recovery was reduced to $3,000 and in the Harvey case, supra, to $5,000. In all of them, however, the injuries and disabilities were less severe than those sustained by plaintiff in the instant case. Other cases cited by defendant are helpful as advisory but not controlling. Plaintiff cites McCaffery v. St. Louis Public Service Co., Mo.Sup., 252 S.W.2d 361; Tate v. Western Union Telegraph Co., 339 Mo. 262, 96 S.W.2d 364; Webb v. Missouri-Kansas-Texas R. Co., 342 Mo. 394, 116 S.W.2d 27; and Gately v. St. Louis-San Francisco R. Co., 332 Mo. 1, 56 S.W.2d 54. In them recoveries of $16,000, $12,500, $10,000 and $20,000, respectively, were allowed. In all of them the injuries and disabilities were more severe than those sustained by plaintiff in the instant case. The case at bar more nearly approaches the situation in Arno v. St. Louis Public Service Co., 356 Mo. 584, 202 S.W.2d 787, in which the Supreme Court ordered a $3,000 remittitur from a $10,000 judgment. See also Fourcade v. Kansas City, 342 Mo. 847, 118 S.W.2d 1, in which a

$10,000 judgment was held not excessive. While the award of $6,250 in the instant case is extremely liberal it yet remains within permissible bounds. It is not an amount which is manifestly unjust or so offensive against all sense of right as to shock the judicial conscience. Bearing in mind the current purchasing power of the dollar, the fact that the fixing of the amount of damages for personal injuries is primarily the function and prerogative of the jury, and the significance of the failure of the trial judge to set aside the verdict as excessive, we see no reason to interfere with this verdict.

The Commissioner recommends that the judgment of the trial court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

ANDERSON, P. J., BENNICK, J., and ADAMS, Special Judge, concur.