**Mary CLAYTON (Plaintiff), Respondent,**

v.

**ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation (Defendant), Appellant.**

No. 29077.

St. Louis Court of Appeals.

Missouri.

March 15, 1955.

Motion for Rehearing or for Transfer to Supreme Court Denied April 15, 1955.

Carroll J. Donohue, Robert O. Hetlage, Salkey & Jones, St. Louis, for appellant.

Hullverson & Richardson, James E. Hullverson, St. Louis, for respondent.

HOUSER, Commissioner.

This is an action for damages brought by Mary Clayton against St. Louis Public Service Company as a result of injuries sustained by her while a passenger on one of defendant's streetcars. A trial jury returned a verdict for $6,250 for plaintiff. The carrier has appealed from the judgment of the circuit court entered upon the verdict, claiming that the trial court erred in failing to declare a mistrial for improper cross-examination and improper argument on the part of plaintiff's counsel with reference to the subject of insurance, and in ruling that plaintiff's doctor's records were available to both parties, thus denying defendant's right to comment in final argument upon the failure of the doctor to produce his records in court; and that the verdict is grossly excessive.

The first question is whether the subject of insurance was improperly and illegally injected into the case. Robert Wieland, an employee of Transit Casualty Company which insured defendant's liability, called on plaintiff the day after the accident, took a signed statement, and thereafter visited plaintiff on several occasions over a period of two or three months. Defendant's counsel in cross-examining plaintiff and certain of plaintiff's witnesses with reference to Mr. Wieland referred to him as a claim agent and representative of or "young man from" the Public Service Company. Defendant produced Mr. Wieland as a witness for defendant, introducing him to the jury as "the representative of the Public Service

Company, the claim agent who called on" plaintiff. Prior to the time Mr. Wieland was placed on the stand counsel for defendant, anticipating that the name of Transit Casualty Company would be brought out during the cross-examination, made an objection out of the hearing of the jury to any reference to the name "Transit Casualty Company" which appeared at the top of memoranda written by the witness in the course of his investigation. The court ruled that plaintiff's counsel had a right to ask Mr. Wieland by whom he was employed. Thereupon the following occurred during the cross-examination of Mr. Wieland by plaintiff's counsel:

"Q. Now, in order to clear up something, I think, did you state you represented Public Service Company when you went out to see Mrs. Clayton? A. I did.

"Q. Now, is that true? A. Yes.

"Q. Is that who you are employed by? A. No.

"Q. Well, who were you employed by the time this happened? A. Transit Casualty Company.

"Q. And who were you representing when you went out to see this lady? A. Public Service Company.

"Q. Were you ever in their employ? A. No.

"Q. But you were representing them when you went out to see her, is that correct? A. I was.

"Q. Would it be possible that you were representing Transit Casualty Company when you went out to see them?

"Mr. DeVoto: Your Honor, I am going to object."

Thereupon, the following occurred outside the hearing of the jury:

"Mr. DeVoto: Counsel has stated, as he indicated at the outset of the testimony, that he would ask one question

as to where this man is employed, and I feel any further reference to the Transit Casualty is trying to inject insurance into this case, and I am going to ask for a mistrial.

"Mr. Hullverson: Well, as I said, there is no question of injecting insurance in this case. I want to get to the bottom of the facts. The man said he had no connection with Public Service and he does work for Transit Casualty, and yet he is going out and seeing Mrs. Clayton. Why? I know why, but I don't know whether there is any connection as far as the jury—

"The Court: Well, you are getting on dangerous ground. I will let you ask one question, whether or not he was representing Transit Casualty when he went out; that is the question I will let you ask.

"Mr. DeVoto: Is that motion overruled?

"The Court: Yes, overruled."

The trial was resumed before the jury as follows:

"Mr. Hullverson: Q. Were you representing Transit Casualty when you went out there? A. Yes.

"Q. So before when you said you were not, that it not true, is that correct? So before when you stated you were not representing them or that you were representing Public Service, that is untrue or ambiguous? A. I think your question is ambiguous. I didn't say I—

"Mr. DeVoto: I object to that, your Honor.

"The Court: Wait a second. I will sustain the objection because the question is argumentative."

In closing argument the following occurred during the argument by plaintiff's counsel:

"I do want to say this with respect to Mr. Wieland, the gentleman who

can't remember who he is working for. Now, isn't that something? A man comes in, under oath, and he can't remember who his employer is. Now, doesn't that strike you as a little odd that a man can come in and have such a remarkable memory for everything except who he works for, and did he admit, after I said, 'Now, are you sure you work for Public Service Company?' 'Yes, I am sure.' And then, 'Don't you honestly work for Transit Casualty Company?' 'Well, yes.' Now, I don't care, you can say, well, it hasn't too much to do with this lawsuit, you can excuse it in any way you want; Mr. DeVoto didn't excuse it in any way, he just overlooked it, but I can't overlook that type of thing, I can't overlook a man who is employed by the Transit Casualty Company comes in and testifies that he works for somebody else, ladies and gentlemen, it was not true."

Thereupon, the following occurred outside the hearing of the jury:

"Mr. DeVoto: I am going to make a motion at this time for a mistrial, your Honor, on counsel's repeated reference to Transit Casualty Company. It is an attempt to inject insurance in the case and prejudice the jury.

"The Court: Motion overruled. Don't go into that."

On this appeal defendant takes the position that counsel for plaintiff, not acting in good faith, unjustifiably and deliberately injected the fact that the liability of defendant was covered by insurance, as a result of which defendant was deprived of a fair trial and an excessive verdict rendered on the basis of the ability of defendant to bear the loss and not on the merits of the case. Defendant claims that the subject of insurance was not relevant, and that there was no necessity for any reference to it; that the cross-examination was not justified in order to establish Wieland's interest in the case because, having admitted that he represented St. Louis Public Service Company, no greater

interest could be shown by establishing that Mr. Wieland was employed by Transit Casualty Company.

We find no error in the action of the trial court in this connection. It is always competent, insofar as it bears upon a witness' credibility, to show the connection between a witness and a party to the cause. Carlson v. Kansas City, Clay County & St. Joseph Auto Transit Co., 221 Mo.App. 537, 282 S.W. 1037, loc. cit. 1041. Wieland's connection with the insurance company was relevant on the question of the interest of the witness. Whether an investigator for an insurance company has a greater or lesser interest in the outcome of a claim against an insured than an investigator for the insured would have is debatable, but it is undeniable that a *different* interest is involved, and plaintiff had a right to reveal the true connection between Wieland, the defendant and the insurance company. Furthermore, the element of credibility is implicit in this situation. Having in mind the reference which counsel for defendant made to the witness Wieland both in the cross-examination of plaintiff and in the direct examination of Mr. Wieland it is impossible to escape the conclusion that the jury was given the mistaken impression that Mr. Wieland was an employee of defendant. Wieland testified that in visiting Mrs. Clayton he represented the Public Service Company. Although indirectly true it was only a half truth, and plaintiff's counsel had the right to correct the impression by showing that he was never employed by the Public Service Company but was an employee of Transit Casualty Company even though it was thereby revealed that there was an insurance carrier in the background. In so doing we cannot attribute to plaintiff's counsel the motive of injecting the subject of insurance into the case for an ulterior purpose, Lindsey v. Rogers, Mo.App., 220 S.W.2d 937, loc. cit. 939, Keynote 3, any more than we could ascribe to defendant's counsel the intention of purposely concealing the facts concerning insurance carriage for selfish advantage. We do not think that bad

faith on the part of counsel for plaintiff has been demonstrated. Nor do we think that there was undue repetition of the reference to Transit Casualty Company or that plaintiff's counsel transcended the bounds of legitimate argument, as claimed. There was no extended inquiry in this connection during the cross-examination of Mr. Wieland, and no more emphasis in the final argument than the situation warranted. This point must be resolved against appellant.

■ The next question is the effect of the action of the court in sustaining an objection to a comment by defendant's counsel in closing argument that plaintiff's chiropractor did not bring his records to court. This involved the court's ruling that defendant could have subpoenaed the records of plaintiff's chiropractor. The record, excerpted from defendant's closing argument, follows:

"In regard to her injuries that we have been talking about here, about this blood pressure and what I have to phrase—I know of no other way— the remarkable memory of Doctor Casey, the chiropractor, who didn't bring his records in, which might have been interesting had he.

"Mr. Hullverson: I object to that, your Honor, the defendant has every right to use a subpoena.

"The Court: Objection sustained.

"Mr. Hullverson: And he can bring them in if he wants to.

"Mr. DeVoto: Your Honor, that witness is the plaintiff's doctor, that was the treating physician. I believe that we had no right to subpoena in or anticipate that he would not bring his records in. That witness was his witness.

"The Court: I will sustain the objection. You could have subpoenaed the records.

"Mr. DeVoto: Doctor Casey could remember 60 to 80 patients a week and could remember back a year before this occurrence that he saw Mrs. Clayton on four occasions, and that brings up another significant point."

Plaintiff takes the position that the only question presented was whether the doctor's records were subject to subpoena by defendant and that the trial court correctly ruled on that limited question. As a dry, academic proposition that position is arguable, but as a practical matter the plain and obvious meaning and import of the objection and ruling of the court, as must have been understood by the jury, was that the doctor's records were equally available to both parties and that consequently no unfavorable inference should be drawn against plaintiff for failing to produce them. "Available" means something more than subject to subpoena, or accessible. Trzecki v. St. Louis Public Service Co., Mo.Sup., 258 S.W.2d 676. These records were made, kept and would have been explained and interpreted by plaintiff's own doctor, who might have been expected to testify in favor of plaintiff and against defendant. Certainly the records were not equally available to defendant prior to the trial, nor until the plaintiff-patient had waived the physician-patient privilege. Nor can it be said that the records were equally available to defendant at the trial, after the privilege had been waived by the act of plaintiff in placing the doctor on the witness stand to testify with reference to plaintiff's injuries. For defendant to have obtained the records at that late hour it would have been necessary to apply to the court for an order to produce or to have caused the issuance of a subpoena duces tecum which, in the exercise of the discretion of the court, might have been denied, Low v. Taylor, 41 Mo.App. 517, or which, having been issued, might have been quashed if in the discretion of the court it was considered unreasonable or oppressive. Section 491.100 RSMo 1949, V.A.M.S. The records were not available to defendant so as to destroy the basis for an unfavorable inference arising from the failure of plaintiff to produce them. It was error for the court to nullify any unfavor-

able inference which defendant was entitled to draw, by sustaining an objection to the argument and in ruling that defendant could have subpoenaed the records. Whether the error effects a reversal of the judgment depends upon whether the inference unfavorable to plaintiff was of sufficient strength and value to materially affect the merits of the action. Section 512.-160(2) RSMo 1949, V.A.M.S.; Wipfler v. Basler, Mo.Sup., 250 S.W.2d 982, loc. cit. 989; Blick v. Nickel Sav. Inv. & Bldg. Ass'n, Mo.Sup., 216 S.W.2d 509, loc. cit. 512. And see Scott v. Kansas City Public Service Co., Mo.App., 115 S.W.2d 518, loc. cit. 526, Keynote 18. . The denial of the right to comment upon plaintiff's failure to call plaintiff's *doctor,* who was not equally available to defendant, constitutes prejudicial error. McInnis v. St. Louis–Southern, 341 Mo. 677, 108 S.W.2d 113. In such case an unfavorable inference arises that the doctor's testimony would have been adverse to plaintiff, and the inference is of such strength and value that the denial of the right to comment thereon is held to constitute a denial of the right of argument to a jury. The inference in that type of case, however, is of considerably greater strength than that which might be drawn from the failure of a doctor to produce his *records* of the case, where the doctor himself is called by and testifies for the plaintiff. While it could be argued from the failure to bring the records that their contents would have impeached the doctor or disclosed injuries less serious than plaintiff claimed, it would be as reasonable to infer that the entries in the records would be in harmony with the testimony of the doctor. Blick v. Nickel Sav. Inv. & Bldg. Ass'n, supra, 216 S.W.2d loc. cit. 512. Therefore, where plaintiff's doctor is produced and testifies freely and in detail with respect to plaintiff's injuries and condition, the denial of defendant's right to comment on the failure of the doctor to produce his records will not necessarily constitute prejudicial error. The value of a doctor's records, either for the purposes of impeachment or corroboration, would depend upon their contents, their accuracy, and the care and attention to detail attending their prep-

aration. In the instant case there is nothing to show that a detailed case history was kept. While the doctor kept records of plaintiff's visits he did not keep a day-by-day record of the condition of his patients unless there was a major change or variation in the condition of the patient, and there was no evidence of such a change in plaintiff's case. There is nothing to show any effort to conceal the records. It appears that the doctor's failure to produce his records was merely inadvertent and unintentional. There is nothing before us to show that the records, if produced, would have revealed any information unfavorable to plaintiff's case. For all that appears, the records may have been merely cumulative and corroborative of plaintiff's case. A reading of the record leads to the conclusion that the reference to the failure of the doctor to bring his records to court was a relatively unimportant part of the argument of defendant's counsel as a whole; that it was parenthetical merely, and strictly incidental to the argument concerning the "remarkable" memory of Dr. Casey, who could remember 60 to 80 patients a week, and could remember back a year previously that he had seen plaintiff on four occasions. The only reference to the records was that the records "might have been interesting" had they been produced. The inference sought to be drawn by counsel was that Dr. Casey's memory, unaided by records, was not reliable and not necessarily that the records, if produced, would have been unfavorable to plaintiff's case. Under all the circumstances, any inference unfavorable to plaintiff would have had little strength or value. We do not believe that the error materially affected the merits of the action.

The last question is whether the verdict of $6,250 is grossly excessive. On September 15, 1952 plaintiff, age 53, fell in a streetcar as a result of a violent lurch. Stating her injuries in that view of the evidence which tends most strongly to sustain the award it appears that as she fell she struck the left side of her head against a vertical bar, turned her left ankle under her right leg and struck her right elbow on the floor

of the car. After the accident she limped to a bus and went to the home of her sister and then to her own home. Her ankle began to swell and her right leg and hip began to give her pain. Later in the day she visited Dr. D. P. Casey, the chiropractor. By that time she could hardly walk. Her whole body was bothering her, from her ankle to her back. The doctor found tenderness and pain in the left ankle, right hip and lower back, and a point of pain and tenderness over the left temporal region. She had tension and sprain, strained muscles and ligaments in the sacroiliac and fifth lumbar region, and pain in the elbow. There were objective symptoms of bruising, swelling and hemorrhaging in the back and ankle. The pain in the ankle resulted from minute hemorrhages. There was some tearing of the soft tissue in her back. Her left leg was "skinned," that is, the skin was "rubbed off" on her ankle where her foot had dragged on the floor. The doctor bandaged her ankle, manipulated her ankle and back, and directed her to soak her foot in hot salt water. Her elbow was swollen and she could not pick up things with her right arm for about three weeks. That condition, however, cleared up. The day after the injury her whole body was generally sore, and she suffered from "terrible, terrific" headaches. Prior to the accident her blood pressure had been about 175. The following day it was between 175 and 180. A month after the accident it went up to 200 and stayed there for almost a year. At times it was considerably higher, once reaching 250. At the time of the trial in February, 1954 her blood pressure was about 180 to 190. Plaintiff visited Dr. Casey about three times a week for three or four weeks following the accident, and thereafter "once a week, every two weeks" until March, 1953. Her ankle was bandaged for two or three weeks. She was confined to her home for three or four weeks, during which time she was "up and down." Although her ankle was swollen and gave her pain, she was able to limp around the house. After three weeks the swelling went down sufficiently for her to get a shoe on her foot. After five or six weeks her ankle was in good enough condition to go downtown. Prior to the accident Dr. W. R. Hart, a dentist, had pulled all her teeth except her six upper front teeth. These teeth, which were sound and healthy before the accident, became sore two or three days thereafter, and in October, 1952 plaintiff went to Dr. Hart, complaining of pain in her remaining teeth. They were not abscessed but the dentist, concluding that the pain was caused by injury to her peridental membrane, extracted the six teeth and supplied her with artificial dentures. Dr. Hart testified that the injury to the membrane at the root of the teeth could result from a blow to the side of the head. From March to September, 1953 she did not visit the chiropractor but during the latter month she resumed her visits in order to receive treatments for her back. She used a heating pad daily on her back for a half hour or an hour at a time for the pain. She was still under treatment for the back and ankle injuries at the time of the trial. Plaintiff still has back trouble, and is still under medical treatment. Sometimes she cannot get out of bed. If she moves furniture or does any heavy lifting she gets "down in the back" and is confined to her bed. Her ankle cramps and aches with a change of weather and swells after she is on it too long. It is weak and twists or turns easily. She has aching pains in the back and sharp pains that shoot down her leg at times, particularly on lifting objects. Dr. Casey was of the opinion that the conditions in her back and ankle are permanent and that pain in the future is to be anticipated in those areas. She has headaches "off and on" for which she uses an ice bag, cold packs and aspirins.

Plaintiff took employment in a bakery in September, 1953 and was still employed there at the time of trial. X-rays revealed no fractures, and she had no cuts or swelling or discoloration of the head. There was no proof of medical or dental bills, loss of wages and she was not hospitalized.

■■ The applicable rules were stated in Schwinegruber v. St. Louis Public Service Co., Mo.App., 241 S.W.2d 782; Jones v. Terminal R. Ass'n of St. Louis, Mo.App.,

246 S.W.2d 356, and more recently applied in Grace v. St. Louis Public Service Co., Mo.App., 263 S.W.2d 866. Defendant claims that under the rule of reasonable uniformity a remittitur in the instant case of $4,250 so as to reduce the award to $2,000 is required under the cases of Kulengowski v. Withington, Mo.App., 222 S.W. 2d 579; Weisman v. Arrow Trucking Co., Mo.App., 176 S.W.2d 37; Brooks v. McCray, Mo.App., 145 S.W.2d 985; Aut v. St. Louis Public Service Co., 238 Mo.App. 1136, 194 S.W.2d 753, 758; Harding v. Kansas City Public Service Co., Mo.App., 188 S.W.2d 60; Taylor v. Terminal R. Ass'n of St. Louis, Mo.App., 122 S.W.2d 944. We have examined these cases, one by one, and have considered the various factors of importance in applying the rule of reasonable uniformity, including the nature, character and extent of the injuries, the presence or absence of special damages, the amount of the awards, and the dates of the decisions. In the enforcement of the rule the number of dollars is not the criterion, because an adjustment must be made for any change in the purchasing power of the dollar between the time of the two awards under consideration. The cases cited by defendant were decided from 1938 to 1949. The awards in those cases must be adjusted upward in comparing them with the $6,250 awarded in the instant case, to the extent that the value of the dollar has decreased since the time they were approved. Insofar as the nature and extent of injury is concerned we are better satisfied with the cases of Russell v. St. Louis Public Service Co., 1952, Mo.Sup., 251 S.W.2d 595; Brady v. St. Louis Public Service Co., 1950, Mo.Sup., 233 S.W.2d 841; Rothweiler v. St. Louis Public Service Co., 1949, Mo.App., 224 S.W.2d 569, and Couch v. St. Louis Public Service Co., 1943, Mo.App., 173 S.W.2d 617. Considering the sex, age, injuries to plaintiff and the amount of the award ($6,250) the Rothweiler case is particularly apposite. The injuries in the Brady case, in which a judgment for $10,000 was held not excessive (but in which special damages of $2,461 were proved), were strikingly similar to the injuries suffered by this plaintiff. Giving full consideration to all of these factors we do not regard the judgment of $6,250 in the instant case as extravagant, and have concluded that this is not a case for appellate interference.

Accordingly, the Commissioner recommends that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

ANDERSON, P. J., RUDDY, J., and WEINSTEIN, Special Judge, concur.